[No. S100099. Jan. 5, 2004.]

In re KANURI SURGURY QAWI, on Habeas Corpus.

6

**COUNSEL**

Renee E. Torres, under appointment by the Supreme Court, for Petitioner.

Bill Lockyer, Attorney General, Pamela Smith-Steward, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General, Stephanie Wald, James M. Humes and Angela Botelho, Deputy Attorneys General, for Respondent.

OPINION

**MORENO, J.—** ■ The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission. (Pen. Code, § 2960 et seq.) Although the nature of an offender's past criminal conduct is one of the criteria for treatment as a mentally disordered offender (MDO), the MDO Act itself is not punitive or penal in nature. (*People v. Superior Court (Myers)* (1996) 50 Cal.App.4th 826, 836–840 [58 Cal.Rptr.2d 32] (*Myers*).) Rather, the purpose of the scheme is to provide MDO's with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder. (Pen. Code, § 2960.)

■ In keeping with the scheme's nonpunitive purpose, Penal Code section 2972, subdivision (g), provides that MDO's who have been civilly committed after their parole period has expired are granted the same rights that are afforded involuntary mental patients under article 7 of chapter 2 of California's general civil commitment scheme—the Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.).[1] Therefore, rather than grant a specific set of rights to former offenders committed under the MDO Act, the Legislature instead chose to reference the rights granted to involuntary patients from the general population who have been civilly committed under the LPS Act.

In this case, we must decide whether respondent Kanuri Surgury Qawi, petitioner below, an MDO, has the right under subdivision (g) of Penal Code section 2972 to refuse antipsychotic medication prescribed for his mental disorder in the absence of a judicial determination of his incapacity to make such a decision. Petitioner here, Dr. Jeffrey Zwerin, Medical Director of Napa State Hospital (hereafter the Director), argues that an MDO has no such right. Qawi argues that he does have that right, subject to limitation only in an emergency situation or in the event he is adjudicated incompetent to refuse medical treatment.

■ We conclude that neither position is entirely correct. We hold that in order to give MDO's the same rights as LPS patients, an MDO can be compelled to take antipsychotic medication in a nonemergency situation only if a court, at the time the MDO is committed or recommitted, or in a separate proceeding, makes one of two findings: (1) that the MDO is incompetent or

---

[1] For clarity, we will refer to "Article 7 (commencing with section 5325) of Chapter 2 of Part 1 of Division 5 of the Welfare and Institutions Code" (Pen. Code, § 2972, subd. (g)) as "Article 7 of the LPS Act" or "Article 7."

incapable of making decisions about his medical treatment; *or* (2) that the MDO is dangerous within the meaning of Welfare and Institutions Code section 5300. As explained below, someone committed or recommitted as an MDO may not necessarily fit in either of these categories; such MDO's would have the right to refuse medication in nonemergency circumstances. The rights of MDO's to refuse medication can be further limited by State Department of Mental Health regulations necessary to provide security for inpatient facilities.

As will be further explained, this interpretation will give MDO's the same right to refuse medication as mentally ill state prisoners, pursuant to Penal Code section 2600. The adoption of the Director's position, on the other hand, would give rise to the incongruity that mentally ill former prisoners committed under the MDO Act would not have the same limited right to refuse medication to which mentally ill current prisoners are statutorily entitled.

## I. FACTS AND STATEMENT OF THE CASE

In August of 1991, Qawi was convicted of felony assault, misdemeanor assault and two counts of misdemeanor battery. He received a four-year sentence. The probation report prepared in connection with this offense indicated that he had attacked a couple in an unprovoked manner, and had made the delusional statement during the attack that it was a blonde woman who caused the Vietnam War.

Qawi was paroled in July of 1993, but his parole was revoked repeatedly. In May of 1994, he was arrested for violating parole after he stalked a sales clerk at a J.C. Penney store. He maintained that the woman, who did not know him, was his wife.

During the incarceration for his second parole violation, Qawi was evaluated, pursuant to Penal Code section 2962 under the MDO Act, for involuntary treatment as a special condition of parole. The evaluators concluded that Qawi met all of the statutory criteria for mental health treatment as a condition of his parole under the MDO Act. During his hospitalization at California Medical Facility at Vacaville, Qawi had been diagnosed with paranoid schizophrenia and paranoid personality disorder. The evaluators noted that Qawi had received 90 days of treatment for his mental disorder and concurred that his mental disorder was not in remission and could not be kept in remission without treatment. The evaluators concluded that he had caused serious bodily injury in committing the felony assault of which he was initially convicted, and his delusional thought process was either the cause of, or an aggravating factor in, both the initial offense for which he was

incarcerated and his subsequent parole violations. The evaluators also agreed that, by reason of his severe mental disorder, Qawi represented a substantial danger of risk of physical harm to others. In reaching this conclusion, the evaluators noted his history of assaultive and threatening behavior during both the incarceration for his initial offense and subsequent detention for his parole violations. One evaluator noted that without medication, respondent "tend[ed] to cycle in and out of decompensated states in which he [was] hostile, paranoid and frequently assaultive." The Board of Prison Terms subsequently found that Qawi met the statutory definition of an MDO and ordered that he be treated as an inpatient by the Department of Mental Health as a special condition of parole.

Qawi's parole status expired in 1997. On January 13, 1997, the superior court found that Qawi continued to meet the statutory criteria for involuntary treatment as an MDO after his parole had expired, and ordered that he be civilly committed for one year.

Qawi's civil commitment and involuntary treatment have been extended annually since 1997. (Pen. Code, § 2972, subd. (e).) Since his initial placement and treatment as an MDO in 1995, none of the petitions or supporting evaluations identify any specific incidents of violence, threats of violence, or property damage that have occurred. However, in several examinations, evaluators have described Qawi as "clearly delusional and grandiose" and have noted that he "expresse[s] some persecutory beliefs regarding his continued incarceration," including that "the State of California had no intention of ever letting him out of the hospital."

Since 1999, the evaluations in support of respondent's continued commitment as an MDO expressly identify respondent's lack of voluntary participation in his treatment plan as the basis for his continued commitment. Qawi has been prescribed antipsychotic medications to treat his paranoid schizophrenia and personality disorder since his initial commitment. Psychiatric evaluations supporting the extension of his MDO status indicate that, despite the fact that he has received antipsychotic medication, he has consistently denied that he is mentally ill, has denied culpability for his initial offense or parole violations, and has remained uninterested and uncooperative in psychotherapy or other forms of psychosocial treatment. Qawi consistently maintains that he suffers no mental illness and requires no medication or other forms of treatment. Evaluators suggest that if "Qawi [were] to be released into the community, it is very likely that he would discontinue medication, decompensate to a more disorganized state, and represent a substantial danger to others."

Although Qawi has consistently voiced his opposition to this treatment, he has not physically resisted the administration of this medication. Until 1998,

he was treated with various phenothiazines—the older generation of antipsychotic medications.[2] In 1996, after Qawi "complained bitterly about the side effects," treatment with antipsychotic medications was discontinued for a two-month "medication holiday." During this time, mild stiffness caused by the medication subsided. However, Qawi's treating psychiatrist noted that the discontinuation of his medication resulted in a "mild but perceptible deterioration in [his] self-care and attendance," and that he had started to refuse psychological testing and behave inappropriately. Qawi was subsequently medicated with a different antipsychotic medication that produced mild muscle side effects. Psychiatric reports state that when medicated, Qawi exhibited a flattened affect and symptoms of anhedonia—the medical term for inability to experience joy. He has also developed arterial hypertension.

Since 1998, Qawi has been treated with Olanzapine and for a period of time he was also injected with the tranquilizer Droperidol every six hours intramuscularly for "agitation." The Director notes that Olanzapine, "a new generation medication," has "fewer serious side effects and a fine record of efficacy." He states that "it has . . . been shown much less likely to cause tardive dyskinesia, a severely troubling and often permanent movement disorder associated with the administration of the older antipsychotic drugs." He states that in this case, Qawi's dosage of Olanzapine is "well within the guidelines developed by the Department of Mental Health" and treatment with this medication "would be considered consistent with community standards in the treatment of paranoid schizophrenia." Qawi claims that despite the change in medication, he suffers "permanent nightmares, high blood pressure, swollen tongue, upset stomach and a hindrance of [his] thought processes."

In November of 2000 respondent filed an original petition for a writ of habeas corpus in the Court of Appeal, which, among other claims, challenged his involuntary medication. The Court of Appeal ordered the Director to show cause why, under subdivision (g) of Penal Code section 2972, Qawi was not entitled to a hearing to determine his competence to refuse to take antipsychotic medication.

On July 24, 2001, in a published decision, the Court of Appeal concluded that the plain meaning of Penal Code section 2972, subdivision (g) is that an MDO is entitled to "all of the 'rights set forth in Article 7 [of the LPS Act],' one of which is to 'refuse treatment with antipsychotic medication.' " The

---

[2] Qawi was medicated with the antipsychotic medication Mellaril during his initial evaluation at the California Medical Facility in Vacaville. After he was transferred to Atascadero, he was medicated with Serentil, Haldol and lithium citrate. After his transfer from Atascadero to Patton State Hospital in February of 1997 he was medicated with Haldol, injected intramuscularly every 28 days.

Court of Appeal held, therefore, "that reading the two statutory schemes together, and following the plain language of Penal Code section 2972, subdivision (g), the Legislature has given a person committed as a mentally disordered offender the same right to refuse antipsychotic medication as a person involuntarily detained under [Welfare and Institutions Code] sections 5150, 5250, 5260 and 5270.15 of the LPS Act."

The Court of Appeal granted in part and denied in part Qawi's petition for writ of habeas corpus and ordered the Director to immediately cease involuntarily medicating Qawi. The Director subsequently petitioned this court for a review and stay of the Court of Appeal decision.[3] In a declaration attached to the stay request, the Director states his opinion that "without his antipsychotic medication, [Qawi] would pose a markedly increased risk to the safety and security of staff and patients at Napa State Hospital." He also states his belief that other MDO's would pose a similar danger without antipsychotic medication. We granted review.

## II. DISCUSSION

Subdivision (g) of Penal Code section 2972 of the MDO Act states, in pertinent part: "Except as provided in this subdivision, the person committed shall be considered to be an involuntary mental health patient and he or she shall be entitled to those rights set forth in Article 7 [of the LPS Act] . . . . [T]he State Department of Mental Health may adopt regulations to modify those rights as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held." (Pen. Code, § 2972, subd. (g).)

As will be explained at greater length below, only certain classes of LPS patients are given the right to refuse medication. The Court of Appeal concluded, and Qawi argues before us, that the plain meaning of the phrase "those rights" in subdivision (g) is that an MDO is entitled to "*all* the 'rights set forth in Article 7,' one of which is to 'refuse treatment with antipsychotic medication.' " Therefore, "the Legislature has given a person committed as a mentally disordered offender the same right to refuse antipsychotic medication as a person involuntarily detained under [Welfare and Institutions Code] sections 5150, 5250, 5260, and 5270.15 of the LPS Act." Stated another way, Qawi argues that subdivision (g) contains no language indicating that an MDO's rights are limited to those afforded a certain category of LPS involuntary mental patients.

The Director argues the Court of Appeal's interpretation of subdivision (g) fails to account for the fact that the right to refuse antipsychotic medication

---

[3] As we granted review, there was no need to issue a stay in this case. (See *Ng v. Superior Court* (1992) 4 Cal.4th 29, 34 [13 Cal.Rptr.2d 856, 840 P.2d 961].)

under Article 7 is a qualified right. More specifically, he contends that MDO's so closely resemble those patients committed under Welfare and Institutions Code section 5300 who have been adjudicated dangerous that, in order to harmonize the two statutory schemes, we must assume the Legislature intended that an MDO's rights be limited to those of a Welfare and Institutions Code section 5300 patient. As explained below, this category of involuntary patient has no statutory right under Article 7 to refuse antipsychotic medication and no statutory right to a capacity hearing.

We conclude that Qawi is incorrect that an MDO has the right to refuse medication as long as he is determined to be competent. As explained below, he does not have such a right if he is determined to be dangerous within the meaning of Welfare and Institutions Code section 5300. But we also conclude that the Director is incorrect in his contention that an MDO does not have the right to refuse medication even if he is determined to be neither dangerous within the meaning of section 5300 nor incompetent to refuse medical treatment.

**A.** *Right Under the Constitution, Common Law, and the LPS Act to Refuse Antipsychotic Medication*

The starting point of the analysis is the "relatively certain principle that a competent adult has the right to refuse medical treatment, even treatment necessary to sustain life." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 530 [110 Cal.Rptr.2d 412, 28 P.3d 151] (*Wendland*); see also *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1317 [271 Cal.Rptr. 199] (*Riese*).) This right is grounded both in state constitutional and common law. (*Wendland, supra*, 26 Cal.4th at p. 531.) The right of privacy guaranteed by the California Constitution, article I, section 1 "guarantees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity." (*Wendland, supra*, 26 Cal.4th at pp. 531–532.)

1. *The Constitutional Right to Refuse Antipyschotic Medication*

That right clearly extends to the right to refuse antipsychotic drugs. (*Riese, supra*, 209 Cal.App.3d at p. 1318; *Keyhea v. Rushen* (1987) 178 Cal.App.3d 526, 540 [223 Cal.Rptr. 746] (*Keyhea*).) No doubt such commonly used drugs, the phenothiazines, have been of considerable benefit to many mentally ill patients. Use of these drugs has greatly reduced the number of mentally ill individuals requiring hospitalization, and the frequency and length of hospitalizations. (See Cichon, *The Right to "Just Say No": A History and Analysis of the Right to Refuse Antipsychotic Drugs* (1992) 53 La. L.Rev. 283, 293.) But they also have been the cause of considerable side

effects. Reversible side effects include akathesia (a distressing urge to move), akinesia (a reduced capacity for spontaneity), pseudo-Parkinsonism (causing retarded muscle movements, masked facial expression, body rigidity, tremor, and a shuffling gait), and various other complications such as muscle spasms, blurred vision, dry mouth, sexual dysfunction, and drug-induced mental disorders. (*Keyhea, supra*, 178 Cal.App.3d at p. 531.) A potentially permanent side effect of long-term exposure to phenothiazines is tardive dyskinesia, a neurological disorder manifested by involuntary, rhythmic, and grotesque movements of the face, mouth, tongue, jaw, and extremities, for which there is no cure. (*Ibid.*) On rare occasions, use of these drugs has caused sudden death. (*Ibid.*)

Although a new generation of antipsychotic drugs, the so-called atypicals, have been regarded as being more benign and effective, considerable controversy remains over both their efficacy and the extent and nature of their side effects. (See Goode, *Leading Drugs for Psychosis Come Under New Scrutiny*, N.Y. Times (May 20, 2003) p. 1.) Moreover, most atypical antipsychotics are difficult to administer without a patient's cooperation, because unlike the older generation of medications, the newer drugs are generally not available in forms that can be injected. (See Mossman, *Unbuckling the "Chemical Straitjacket": The Legal Significance of Recent Advances in the Pharmacological Treatment of Psychosis* (2002) 39 San Diego L.Rev. 1033, 1078, fn. 214.) Also, phenothiazines are cheaper than atypicals and are still the most widely used class of drugs to treat psychosis. (See Julien, A Primer of Drug Action (9th ed. 2001) p. 339.) The basic constitutional and common law right to privacy and bodily integrity is therefore especially implicated by the forced administration of medications with such potential adverse consequences.[4]

 The right to refuse antipsychotic medication is not, however, absolute, but is limited by countervailing state interests. One such interest is *parens patrie*, the state's interest "in providing care to its citizens who are unable . . . to care for themselves." (*Addington v. Texas* (1979) 441 U.S. 418, 426 [60 L.Ed.2d 323, 99 S.Ct. 1804].) In California, *parens patrie* may be used only

---

[4] We emphasize that this opinion is concerned with the right to refuse antipsychotic medication and not mental health treatment in general. We note that the purpose of the MDO Act is to provide such treatment for the benefit of the individual and the protection of the public. (Pen. Code, § 2970.) Whether an individual already deprived of substantial liberty through an MDO commitment may refuse to participate in noninvasive treatments incidental to that commitment, or to opt out of a treatment program altogether, presents very different considerations from whether he or she may refuse antipsychotic medication. As explained, the coercive administration of such medication, with its potentially serious side effects, imposes a significant additional burden on the MDO's liberty interest. (See *Sell v. United States* (2003) 539 U.S. 166 [156 L.Ed.2d 197, 123 S.Ct. 2174, 2186–2187] [defendant incarcerated pending trial may not be forcibly medicated for purposes of rendering him competent to stand trial unless upon a showing that such medication is necessary and there is no reasonable alternative].)

to impose unwanted medical treatment on an adult when that adult has been adjudged incompetent. (See *Wendland, supra*, 26 Cal.4th at p. 535.)

■ Another such countervailing state interest is in institutional security. "It is . . . well-established that when an individual is confined in a state institution, individual liberties must be balanced against the interests of the institution in preventing the individual from harming himself or others residing or working in the institution." (*Jurasek v. Utah State Hospital* (10th Cir. 1998) 158 F.3d 506, 510.) Thus, even a competent prison inmate, for example, may be forcibly medicated, consistent with the federal due process clause, if it is determined that he is a danger to himself and others, and that the treatment is in his medical interest, as determined by an independent medical board. (*Washington v. Harper* (1990) 494 U.S. 210, 229 [108 L.Ed.2d 178, 110 S.Ct. 1028].)

## 2. *The Statutory Right to Refuse Antipsychotic Medication*

This right to refuse antipsychotic medication is recognized in the LPS Act, the primary statutory scheme for civilly committing those who are mentally ill. In order to fathom the precise nature of that right, it is necessary to understand the LPS Act generally and how it confers rights on those within its purview.

■ The LPS Act provides for the prompt evaluation and treatment of mentally disordered persons, developmentally disabled persons and persons impaired by chronic alcoholism, while protecting public safety and safeguarding individual rights through judicial review. (*California State Psychological Assn. v. County of San Diego* (1983) 148 Cal.App.3d 849, 854–855 [198 Cal.Rptr. 1]; Welf. & Inst. Code, § 5000 et seq.) Relevant here are the provisions of the LPS Act that govern the involuntary treatment of persons with mental disorders. "Under the LPS Act, a person who is dangerous or gravely disabled due to a mental disorder may be detained for involuntary treatment. However, in accordance with the legislative purpose of preventing inappropriate, indefinite commitments of mentally disordered persons, such detentions are implemented incrementally." (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 979 [107 Cal.Rptr.2d 776].) Accordingly, an individual with a mental disorder may be involuntarily evaluated in a county-designated facility for as little as 72 hours if that person is either "a danger to others, or to himself or herself" or "gravely disabled" (Welf. & Inst. Code, § 5150), but this initial 72-hour evaluation may lead to civil commitments lasting 14 days, 30 days, and 180 days, and, in certain circumstances, to the establishment of a conservatorship on an annual basis. (See Welf. & Inst. Code, §§ 5250 et seq., 5260 et seq., 5270 et seq., 5300 et seq., 5350 et seq.)

The LPS Act has been called a "Magna Carta for the Mentally Ill" that "established the most progressive . . . commitment procedures in the country." (Assem. Subcom. on Mental Health Services, Dilemma of Mental Commitments in California (1978) foreword by Assemblyman Louis Papan.) "The rights of involuntarily detained mentally disordered people in California are scrupulously protected by the [LPS Act]." (*Thorn v. Superior Court* (1970) 1 Cal.3d 666, 668 [83 Cal.Rptr. 600, 464 P.2d 56].) The LPS Act, in Article 7, confers rights on patients in two ways. First, it affirms that "[p]ersons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California, unless specifically limited by federal or state law or regulations." (Welf. & Inst. Code, § 5325.1.) Underlying this general right is "one of the cardinal principles of LPS," namely "that mental patients may not be presumed incompetent solely because of their hospitalization. As stated in [Welfare and Institutions Code] section 5331, 'No person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . regardless of whether such evaluation or treatment was voluntarily or involuntarily received.' Similarly, [Welfare and Institutions Code] section 5326.5, subdivision (d), which is part of a section defining the written consent required in certain circumstances, reiterates the basic idea that: '[a] person confined shall not be deemed incapable of refusal [of proposed therapy] solely by virtue of being diagnosed as a mentally ill, disordered, abnormal, or mentally defective person.' " (*Riese, supra,* 209 Cal.App.3d at p. 1315, fn. omitted.)

Second, the LPS Act "specifies a nonexclusive list of rights including '[a] right to dignity, privacy, and humane care' ([Welf. & Inst. Code,] § 5325.1, subd. (b)) and '[a] right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect. Medication shall not be used as punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program.' ([*Id.,*] § 5325.1, subd. (c).)" (*Riese, supra,* 209 Cal.App.3d at p. 1314.)

The presumption that LPS patients are competent to refuse antipsychotic medication unless proven otherwise is based on a recognition that "mental illness 'often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . many mentally ill persons retain the capacity to function in a competent manner.' " (*Riese, supra,* 209 Cal.App.3d at p. 1321.) " 'Competence is not a clinical, medical, or psychiatric concept. It does not derive from our understanding of health, sickness, treatment, or persons as patients. Rather, it relates to the world of law, to society's interest in deciding whether an individual should have certain rights (and obligations) relating to person, property and relationships.' " (*Ibid.*) The *Riese* court opined that "[j]udicial determination of the specific competency to consent to

drug treatment should focus primarily upon three factors: (a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought ([Welf. & Inst. Code,] § 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese, supra*, 209 Cal.App.3d at pp. 1322–1323.)

In *Riese*, this right to refuse antipsychotic medication was applied specifically to patients who had been subject to short-term involuntary detention and treatment for an initial 72 hours and certified as gravely disabled or as a danger to self or others for 14 days' additional treatment under Welfare and Institutions Code sections 5150 and 5250. *Riese*'s recognition of the right to refuse medication if competent has been codified in the LPS Act, Article 7, in sections 5325.2 and 5332. Section 5325.2 provides that those "subject to detention pursuant to Section 5150, 5250, 5260, or 5270.15 shall have the right to refuse treatment with antipsychotic medication subject to provisions set forth in this chapter." Section 5332, subdivision (b) provides that if a person exercises the right to refuse antipsychotic medication, that refusal can only be overridden "upon a determination of that person's incapacity to refuse the treatment, in a hearing held for that purpose." Section 5008 of the LPS Act defines "antipsychotic medication" as "any medication customarily prescribed for the treatment of symptoms of psychoses and other severe emotional disorders." (Welf. & Inst. Code, § 5008, subd. (l).)

██ But the reasoning of *Riese* makes clear that the right does not apply solely to short-term LPS patients. Furthermore, the LPS Act provides that those gravely disabled individuals who are subject to an LPS conservatorship can be required by their conservator to accept medical treatment "if specified in the court order" creating the conservatorship. (Welf. & Inst. Code, § 5358.) In other words, medical treatment can be compelled for a conservatee "only if such treatment is authorized in the court order of conservatorship or in a subsequent court order (except in medical emergencies)." (*Keyhea, supra*, 178 Cal.App.3d at p. 535.) As *Keyhea* recognized, such a court order divesting the conservatee of the right to make his or her own medical decisions cannot be made " '*absent a specific determination by the court that the conservatee cannot make those decisions.* In view of the fundamental nature of the right affected, the court should not make such a determination unless it finds that the conservatee lacks the mental capacity to rationally understand the nature of the medical problem, the proposed treatment and the attendant risks.' " (*Ibid.*, italics in original, citing 60 Ops.Cal.Atty.Gen. 375, 377 (1977).) The *Keyhea* court further affirmed that under the relevant

statutes, this principle applies to psychiatric treatment, including administration of antipsychotic medication, as much as to other forms of medical treatment, and that therefore "LPS conservatees have a right to refuse involuntary long-term psychotropic medication absent a judicial determination of their incompetency to do so." (*Keyhea*, at p. 536.) Thus, as the Director recognizes, and contrary to the central premise of the dissenting opinion, the long-term LPS Act conservatee possesses the right to refuse antipsychotic medication absent a determination of incompetence.

■ The LPS Act also acknowledges a limit on the right to refuse medication derived from the need for institutional security. That acknowledgment comes in essentially two forms. First, the LPS Act permits involuntary medication in emergency situations. (Welf. & Inst. Code, § 5332, subd. (e).) An emergency is defined as "a situation in which action to impose treatment over the person's objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others, and it is impracticable to first gain consent." (*Id.*, § 5008, subd. (m).) In order to provide this treatment, "[i]t is not necessary for harm to take place or become unavoidable." (*Ibid.*)

■ Second, the LPS Act implicitly addresses state interests in institutional security in nonemergency situations by not including patients committed under Welfare and Institutions Code section 5300 (hereafter section 5300) among those patients with the right to refuse medication. Such patients have neither the right to a capacity hearing possessed by LPS short-term patients (Welf. & Inst. Code, §§ 5325.2, 5332, subd. (b)) nor the right to a court determination of competency to refuse medical treatment possessed by long-term LPS conservatees (Welf. & Inst. Code, § 5358; *Keyhea, supra*, 178 Cal.App.3d at p. 536). Qawi argues that we cannot infer from the absence of the right to refuse medication under section 5300 that the section 5300 patient is denied that right. But the fact that a section 5300 patient is the *only* class of LPS patients not afforded the right makes such an inference unavoidable.

Although the reason for not permitting section 5300 patients the right to refuse medication is not made plain in the statutes or the legislative history, the only characteristic that sets them apart from the short-term and long-term LPS patients given that right is, as the Attorney General correctly argues, the fact that the section 5300 patient poses a "demonstrated danger of inflicting harm upon others." Under section 5300, a person who has been certified for intensive 14-day treatment after the initial 72-hour evaluation and treatment period may be confined for further postcertification "treatment pursuant to the provisions of this article for an additional period, not to exceed 180 days" if a "demonstrated danger" is established. (See *People v. Superior Court (Dodson)* (1983) 148 Cal.App.3d 990, 992–993 [196 Cal.Rptr. 431].)

Because the state's substantial interest in institutional security must be balanced by the constitutional and common law rights to refuse antipsychotic medication discussed above, a statute seeking to balance such rights and interests by forcing certain dangerous patients to take antipsychotic medication against their will must define appropriately what constitutes "dangerous." At one end of the spectrum, a regime of forced medication based on a vague and generalized suspicion of dangerousness would likely violate the state, if not the federal, Constitution. (See *Sell v. United States, supra*, 539 U.S. at pp. 183–185 [123 S.Ct. at pp. 2186–2187] [questionable whether government can justify involuntary antipsychotic medication of person neither incompetent nor dangerous].) At the other end, the forced medication of an LPS patient who repeatedly acts out violently would no doubt be constitutionally justified.

Section 5300 is quite specific in how it addresses this problem, requiring two types of findings of dangerousness. First, there must be a generalized finding of "demonstrated danger" to others. "Demonstrated danger may be based on assessment of [the person's] present mental condition, which is based upon a consideration of past behavior of the person within six years prior to the time the person attempted, inflicted, or threatened physical harm upon another, and other relevant evidence." (Welf. & Inst. Code, § 5300.5.)

In addition to demonstrated danger, one of the following findings establishing recent acts or threats of violence must be made in order to effect a section 5300 commitment: "(a) The person has attempted, inflicted, or made a serious threat of substantial physical harm upon the person of another after having been taken into custody, and while in custody, for evaluation and treatment . . . (b) The person had attempted, or inflicted physical harm upon the person of another, that act having resulted in his or her being taken into custody . . . (c) The person had made a serious threat of substantial physical harm upon the person of another within seven days of being taken into custody, that threat having at least in part resulted in his or her being taken into custody." (Welf. & Inst. Code, § 5300; see also *id.*, § 5304, subd. (a).) A person may be recommitted under section 5300 if during the 180-day postcertification period, he or she "has attempted, inflicted, or made a serious threat of substantial physical harm upon another" and continues to be a "demonstrated danger" as defined above. (*Id.*, § 5304, subd. (b).)

To summarize, the LPS Act balances the constitutional and common law right to refuse antipsychotic medication with the state interests in caring for individuals who cannot care for themselves and in providing security in institutional settings. This balance is achieved by granting involuntarily committed LPS patients a qualified right to refuse medication. A patient may refuse medication unless (1) the person is determined to be incompetent, that is, incapable of making rational decisions about his own medical treatment; or (2) medication is administered pursuant to an emergency situation, as

defined by the LPS Act; or (3) the person is committed under section 5300 after a particularized showing that the person is a demonstrated danger and that he or she was recently dangerous, as defined by that statute.

## B. *The Rights of State Prisoners to Refuse Medication*

The qualified right of LPS patients to refuse antipsychotic medication, described immediately above, is virtually identical to the right possessed by mentally ill state prisoners. As elaborated below, the fact that mentally ill state prisoners have a qualified right to refuse such medication is highly relevant for determining whether MDO's have that right.

In *Keyhea, supra,* 178 Cal.App.3d 526, the court reviewed and ultimately upheld a consent decree affirming the right of state prisoners to refuse antipsychotic medication except under certain limited circumstances. The starting point of its analysis was Penal Code section 2600, which provided at the time that a state prisoner could only be deprived of such rights "as is necessary in order to provide for the reasonable security of the institution . . . and for the reasonable protection of the public." (Added by Stats. 1975, ch. 1175, § 3, p. 2897.) It first concluded that section 2600 was intended to protect statutory as well as constitutional rights. (*Keyhea, supra,* 178 Cal.App.3d at pp. 533–534.) It then concluded, based on a review of the rights of LPS conservatees discussed above, as well as the rights of those without conservators, that nonprisoners generally have the right to refuse antipsychotic medication unless found to be incompetent and that this right should therefore also be afforded to prisoners. (*Keyhea, supra,* 178 Cal.App.3d at pp. 534–539.) It then affirmed that no security interests prevented such competency hearings. (*Id.* at p. 542.)

The consent decree in *Keyhea* eventually became a permanent injunction specifying in considerable detail the circumstances under which a prisoner may be forced to take antipsychotic medication. That permanent injunction was in turn incorporated into Penal Code section 2600 in a 1994 amendment. The 1994 amendment broadened the discretion of prison officials to limit the rights of state prisoners, allowing prisoners to be deprived of such rights "as is reasonably related to legitimate penological interests." (Stats. 1994, ch. 555, § 1, p. 2821.) But section 2600 was also amended to specify that "[n]othing in this section shall be construed to permit the involuntary administration of psychotropic medication unless the process specified in the permanent injunction dated October 31, 1986, in the matter of *Keyhea v. Rushen,* 178 Cal.App.3d 526 [223 Cal.Rptr. 746], has been followed." (*Ibid.*) That injunction, which may be found on the Web site of the California Department of General Services, Office of Administrative Hearings (Order Granting Plaintiff's Motion for Clarification and Modification of Injunction and

Permanent Injunction, *Keyhea v. Rushen* (Super. Ct. Solano County, Oct. 31, 1986, No. 67432) <http://www.oah.dgs.ca.gov/laws/keyhea.asp> [as of Jan. 5, 2004]) (hereafter *Keyhea* injunction), therefore has the force of statutory law. Because the essential premise of the injunction was to incorporate the LPS patient's right to refuse medication into the rights granted state prisoners under Penal Code section 2600, the *Keyhea* injunction's approach is highly relevant to the issue posed by the present case.

The *Keyhea* injunction provides a process whereby a prisoner who is subject to mental health treatment, after being administered involuntary medication for up to 72 hours, may be certified for additional involuntary medication up to 21 days if the prisoner is, "as a result of mental disorder, gravely disabled and incompetent to refuse medication for the danger to others, or danger to self." (*Keyhea* injunction, *supra*, pt. II.A.1., p. 6.) The prisoner, with the assistance of an attorney or advocate, may contest certification. A certification review hearing is conducted by the court-appointed hearing officer and if, at the conclusion of the hearing, the hearing officer concludes that the prisoner is neither gravely disabled and incompetent nor a danger to others or to self, involuntary medication must be discontinued. (*Id.*, pts. II.I., II.M., pp. 11, 13.) A prisoner may not be medicated involuntarily for more than 24 days without an order from the superior court. The order authorizing involuntary medication must find, by clear and convincing evidence, as above, that the prisoner, as a result of mental disorder, is gravely disabled and incompetent to refuse medication or a danger to self. (*Id.*, pt. III.F., p. 18.) The injunction also permits emergency involuntary medication under certain specified conditions. (*Id.*, pt. III.J., pp. 20–21.)

Most relevant for purposes of this case, the *Keyhea* injunction defines "danger to others" "in substantial accord with Welfare and Institutions Code section 5300," and requires essentially the same findings of demonstrated danger and recent dangerousness as in section 5300, discussed above. (*Keyhea* injunction, *supra*, pt. I.4., p. 4.) A prisoner will be considered a danger to others only if he or she has attempted, inflicted or made a serious threat of "substantial physical harm upon the person of another" either after being taken into custody or as the cause of being taken into custody, as specified in section 5300, and "presents, as a result of mental disorder, demonstrated danger of inflicting substantial physical harm upon others." (*Keyhea* injunction, *supra*, pt. I.4.b., p. 4.) "Custody" refers to "confinement in an inpatient psychiatric unit." The order is only good for 180 days (or a shorter time if specified by the court) in the case of those determined to be a danger to self

or others, with new orders being subject to the same procedural protections as the original orders. (*Id.*, pt. III.I.)[5]

 Thus, the circumstances under which a state prisoner can be subject to involuntary medication are substantially similar to those of the LPS patient. With this background in mind, we turn to the MDO Act and to the rights granted therein.

## C. *Rights Under the MDO Act*

The MDO Act permits the government to civilly commit for mental health treatment certain classes of state prisoners during and after parole. Briefly, a paroled offender may be civilly committed as a condition of parole under the MDO Act if a specified team of mental health professionals finds that the offender has "a severe mental disorder [that] is not in remission, or cannot be kept in remission without treatment, . . . and that by reason of his or her severe mental disorder the prisoner represents a substantial danger of physical harm to others," and has met certain other conditions not relevant here. (Pen. Code, § 2962, subd. (d).) The term "substantial danger of physical harm to others" is not defined. The statute declares that "[a] person 'cannot be kept in remission without treatment' if during the year prior to the question being before the Board of Prison Terms . . . , he or she has been in remission and he or she has been physically violent, except in self-defense, or he or she has made a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family, or he or she has intentionally caused property damage, *or he or she has not voluntarily followed the treatment plan.*" (*Id.*, § 2962, subd. (a), italics added.) The MDO may request a jury trial to contest this commitment and the jury must find the above conditions are met beyond a reasonable doubt. (*Id.*, § 2966, subd. (a).)

If the prisoner's mental disorder cannot be kept in remission during the parole period, the district attorney may then file a petition in the superior court for a continuing commitment based on essentially the same grounds as for the parole period. (Pen. Code, § 2970.) Commitment is subject to jury trial and is for a period of one year (*id.*, § 2972, subds. (a) & (c)), which may

---

[5] The *Keyhea* injunction's treatment of those dangerous to others differs in one significant respect from Welfare and Institutions Code section 5300. In the latter case, recommitment must be based on actual, attempted or threatened violence within the previous 180-day commitment period. (Welf. & Inst. Code, § 5304, subd. (b).) The *Keyhea* injunction does not require new acts to renew the compulsory medication order, but only a renewed finding that the individual presents a demonstrated danger of inflicting substantial physical harm on others due to a mental disorder. (See *Keyhea* injunction, *supra*, pts. I.4., III.I.2.; *Department of Corrections v. Office of Admin. Hearings* (1998) 66 Cal.App.4th 1100, 1108 [78 Cal.Rptr.2d 473].)

be renewed for an additional year if the same findings are made in a recommitment proceeding (*id.*, § 2972, subd. (e)). (See *Myers, supra*, 50 Cal.App.4th at pp. 830–832.)

As stated, Penal Code section 2972, subdivision (g) declares in pertinent part: "Except as provided in this subdivision, the person committed shall be considered to be an involuntary mental health patient and he or she shall be entitled to those rights set forth in Article 7 (commencing with Section 5325) [of the LPS Act]." As explained above, Article 7 of the LPS Act, read in context, provides that a patient has the right to refuse antipsychotic medication unless (1) the person is determined to be incompetent, that is, incapable of making rational decisions about his own medical treatment; or (2) the medication is administered pursuant to an emergency situation; or (3) the person is committed under section 5300 after a specified showing that the person is a demonstrated danger and that he or she was recently dangerous.

■■■ An individual may be adjudicated an MDO without meeting any of these criteria. Although an MDO must be determined to have a "severe mental disorder," commitment for a mental disorder does not by itself mean that individuals are incompetent to participate in their own medical decisions. (Welf. & Inst. Code, §§ 5326.5, subd. (d), 5331; *Riese, supra*, 209 Cal.App.3d at pp. 1315–1316.) ■■■ Nor does the housing of an MDO give rise, by itself, to an emergency situation. Nor does the MDO necessarily meet the criteria of dangerousness set forth in section 5300. As observed, the "substantial danger of physical harm to others" is without definition. In context, it appears to mean a prediction of future dangerousness by mental health professionals. Section 5300, in addition to requiring an assessment of future dangerousness, also requires a finding of recent dangerousness as evidenced by tangible acts or threats of violence.

■■■ The MDO Act's definition of the phrase "cannot be kept in remission without treatment" may be met by a finding of recent dangerousness, because that will be found when the person "has been physically violent, except in self-defense, or . . . has made a serious threat of substantial physical harm upon the person of another" within the year prior to the commitment or recommitment proceeding. (Pen. Code, § 2962, subd. (a).) But a finding of recent dangerousness is not required. The "cannot be kept in remission without treatment" standard can also be found when a person "has not voluntarily followed the treatment plan" during the year prior to the commitment or recommitment proceeding. (*Ibid.*) Moreover, Penal Code section 2962, subdivision (f) states that " 'substantial danger of physical harm' does not require proof of a recent overt act." ■■■ We therefore conclude that an MDO does not lose the right to refuse antipsychotic medication merely by

being adjudicated an MDO, but only if he falls within the categories, enumerated above, of those not entitled to refuse antipsychotic medication within the LPS Act.

We therefore reject the Director's argument that the MDO loses the right to refuse medication because he or she has been determined to be dangerous at some point in the past. The competent LPS patient loses the right to refuse medication only when a statutorily specified showing of dangerousness has been made that includes findings of recent dangerousness, as specified above. If an MDO could be deprived of the right to refuse unwanted medication by a substantially lesser showing of dangerousness than is required for such deprivation under the LPS Act, then in truth the MDO would not have the same rights as the LPS patient.

■ Such an interpretation of the MDO's rights would not only make those rights consistent with those given under the LPS Act, as the MDO Act mandates, but also with those rights given to state prisoners under Penal Code section 2600 and the *Keyhea* injunction. As discussed above, mentally ill state prisoners can only be forcibly medicated in nonemergency situations without a finding of incompetence if they are found to be a danger to self or others, with "danger to others" defined in conformity with section 5300. Adopting the Director's interpretation, on the other hand, would mean that those former state prisoners subject to civil commitment as MDO's would have a lesser right to refuse antipsychotic medication than mentally ill state prisoners in custody. There is no indication the Legislature intended this incongruity. Rather, Penal Code section 2972, subdivision (g) provides that MDO's are to have the same rights as LPS patients and, implicitly, as mentally ill state prisoners under section 2600, whose statutory right to refuse medication is derived from the rights granted LPS patients.

■ Of course, an MDO has against him or her not only a prediction of future dangerousness but also a conviction for one of a number of serious felonies. But neither the LPS Act nor Penal Code section 2600 limits the right to refuse medication on the basis of prior felony convictions, and indeed, mentally ill state prisoners will often have been convicted of serious or violent felonies. There is no reason to believe the Legislature intended that an MDO's rights should be more circumscribed because of prior felony convictions than others committed to involuntary treatment.

■ In adopting this interpretation of the MDO statute, we also reject Qawi's position, and that of the Court of Appeal below, that all competent MDO's have the right to refuse medication. If an MDO were given the right to refuse medication even if he or she were determined to be dangerous within the meaning of Welfare and Institutions Code section 5300, as Qawi

urges, then he or she would have a greater right to refuse medication than the LPS patient, contrary to statutory mandate.

The Director raises concerns about institutional safety if some MDO's are allowed to refuse antipsychotic medication. It may or may not be the case that permitting MDO's under certain circumstances to refuse medication will create security problems for the institutions housing and treating these patients. The Legislature well understood that granting wholesale to an MDO an LPS patient's rights might cause institutional security problems. It provided a specific remedy for these problems. Penal Code section 2972, subdivision (g), explicitly delegates to the State Department of Mental Health the authority to "adopt regulations to modify those rights as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held." Thus the Legislature did not authorize the courts to limit the rights of MDO's based on speculation about what *might* happen if MDO's were allowed to fully assume the rights of LPS patients. Rather, the Legislature chose to delegate to the Department of Mental Health the authority to impose such limits if its experience in administering institutions in which MDO's were housed established that such regulations were "necessary in order to provide for the reasonable security of the inpatient facility." (Pen. Code, § 2972, subd. (g).) It is not for us to second guess this legislative choice.

The Director also cites *In re Locks* (2000) 79 Cal.App.4th 890 [94 Cal.Rptr.2d 495] in support of his position. In *Locks*, a state prisoner serving a life sentence for murder was charged with battery of a prison guard. He was initially found incompetent to stand trial and was committed to Atascadero State Hospital (ASH) for treatment. He was eventually found competent, and a trial court, after psychiatric examination, accepted his plea of not guilty by reason of insanity. He was committed to ASH and was treated with antipsychotic medication over his objection. After two years and a determination that he had not recovered sanity, he sought habeas corpus relief to establish his right to refuse medication. (*Id.* at pp. 892–893.)

The Court of Appeal upheld the trial court's denial of his petition. It conceded that adjudication of Locks's insanity did not necessarily mean that he·was incompetent to refuse medication. (*Locks, supra,* 79 Cal.App.4th at pp. 894–896.) But it concluded he was not entitled to a separate hearing other than the hearings committing and recommitting him to ASH pursuant to Penal Code section 1026. The court did not determine what statutory rights are conferred on a prisoner committed to a mental hospital after being adjudicated not guilty by reason of insanity. Instead, it observed that, "for example," a mentally ill state prisoner whose rights were governed by Penal Code section 2600 and a *Keyhea* injunction did not have a right to refuse

medication if it was determined by clear and convincing evidence that he was "a danger to others." (*Locks, supra,* 79 Cal.App.4th at pp. 896–897.) It then reasoned that an adjudication pursuant to Penal Code section 1026.2 that Locks was not yet eligible for release "presumes that he is a danger to others." (79 Cal.App.4th at p. 897.) The court concluded that because he is a danger to others, he can, within the meaning of section 2600, be denied the right to refuse antipsychotic medication. (*Locks,* at p. 897.)

The reasoning in *Locks* is flawed in at least two respects. First, inasmuch as it purports to apply Penal Code section 2600 and the *Keyhea* injunction to the facts before it, its application is incorrect. As discussed, the *Keyhea* injunction defines specifically what "danger to others" means, requiring particular findings of recent acts of dangerousness pursuant to Welfare and Institutions Code section 5300. The *Locks* court failed to acknowledge, much less apply, this standard. Second, it is not clear whether Penal Code section 2600 applied to Locks, who was a state prisoner but was also committed to a state mental hospital pursuant to Penal Code section 1026. The *Locks* court failed to identify the statutory and/or constitutional rights that govern persons committed after an adjudication of not guilty by reason of insanity. These questions are beyond the scope of the present case. Thus, we need not determine whether the result in *Locks* was correct. It is enough to recognize that its holding does not extend to MDO's explicitly granted the statutory rights of the LPS patient.[6]

### D. *Standard and Application to the Present Case*

We therefore hold that an MDO can be compelled to be treated with antipsychotic medication under the following nonemergency circumstances: (1) he is determined by a court to be incompetent to refuse medical treatment; (2) the MDO is determined by a court to be a danger to others within the meaning of Welfare and Institutions Code section 5300.[7] An MDO's right to refuse such medication may also be limited pursuant to State Department of

---

[6] The distinction between Penal Code section 1026 and the MDO Act is underscored by an uncodified portion of the latter, which states: "The Legislature finds and declares that Department of Corrections prisoners subject to the provisions of this act are in a separate, distinct class from persons who have been committed by the State Department of Mental Health under the provisions of Section 1026 . . . . Therefore, it is not intended that any provision of this act be construed in any way to [a]ffect the status of persons committed to the State Department of Mental Health under Section 1026 . . . ." (Stats. 1985, ch. 1419, § 2.75, p. 5018.)

[7] Because the circumstances under which an MDO is committed differs from a section 5300 commitment, we do not believe an exact adherence to the time frames set forth in section 5300 is necessary. As explained, initial commitment under section 5300 occurs after the expiration of 14 days of treatment and observation and may be based on physical harm attempted or inflicted or threats while the patient was in custody or that caused him or her to be taken into custody, or serious threats of substantial physical harm within seven days of being taken into custody. Commitment and recommitment are for a period of 180 days and recommitment is

Mental Health regulations modifying the MDO's rights as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held.[8] A determination that a patient is incompetent to refuse medical treatment, or is dangerous within the meaning of section 5300, may be adjudicated at the time at which he or she is committed or recommitted as an MDO, or within the commitment period.

In the present case, from the facts reviewed above, it is unclear whether Qawi fits any of the above categories. His competence to refuse medical treatment has not been adjudicated. It is not clear from the record whether he has engaged in violence or threats within the relevant period. Because the statutory standard we would adopt differs from that of the Court of Appeal, remand for application of that standard is appropriate.

### III. DISPOSITION

The judgment of the Court of Appeal is reversed and the cause is remanded for proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**BROWN, J.,** Dissenting.—In designating rights retained by mentally disordered offenders (MDO's) upon commitment pursuant to Penal Code section 2972, the Legislature did not set a broad or unqualified standard. Indeed, the statute could hardly be more precise in specifying its intended limits. Rather than respecting this carefully crafted legislative scheme, however, the majority ranges well outside the designated boundaries and formulates an answer that is at best a patchwork of extraneous and irrelevant statutory and decisional law. At worst, it will achieve the opposite of the legislative intent: MDO's permitted to refuse antipsychotic medication will not receive necessary treatment for their mental disorders and their refusal will effectively subject them to indefinite commitment with little prospect of habilitation, precisely the type of warehousing the Legislature sought to avoid. I dissent.

The MDO Act (Pen. Code, § 2960 et seq.) comprises comprehensive legislation addressing both the need to protect the public from the danger

---

based on the above activity recurring sometime within the prior 180-day period. (Welf. & Inst. Code, § 5304, subd. (b).) In the case of an MDO, he is already in custody as a prisoner at the time his MDO status is adjudicated, and the time frame used to adjudicate that status, both for purposes of commitment and recommitment, is the year prior to the adjudication. (Pen. Code, §§ 2962, subds. (a), (d)(1), 2972, subds. (c), (e).) We believe it is a reasonable translation of LPS rights into the context of the MDO Act to hold that a court considering whether medication may be involuntarily administered to an MDO should consider whether he or she has committed the types of violent or threatening acts specified in section 5300 within the year prior to the commitment or recommitment.

[8] No such regulations have been issued as yet.

posed by mentally disordered offenders and the state's interest in providing treatment for such individuals to the fullest extent possible. Accordingly, the commitment of MDO's is within the purview of an entirely different statutory scheme from the Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.[1]), and provisions of the latter are applicable to MDO's only to the extent provided by the Legislature. (Cf. Pen. Code, § 2974 [upon release from prison or termination of parole, an inmate who does not come within the provisions of the MDO Act but who is a danger to self or others or is gravely disabled may be placed in a state hospital pursuant to the LPS Act].)

The standards and procedures for commitment or recommitment of an MDO upon termination of parole are set forth in Penal Code section 2972. The individual's MDO status is determined at a jury or court trial by proof beyond a reasonable doubt. (Pen. Code, § 2972, subd. (a).) The trier of fact must find "that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others . . . ." (*Id.*, § 2972, subd. (c).) Thus, the premise of such commitment—indeed, of the entire MDO Act—is the "substantial danger of physical harm" posed by the MDO's "severe mental disorder." (See *id.*, §§ 2962, subd. (d)(1), 2966, subd. (c), 2970; see generally *id.*, § 2960.) As defined in Penal Code section 2962, subdivision (f), " 'substantial danger of physical harm' does not require proof of a recent overt act."

Although the primary purpose of the MDO Act is to ensure public safety, amelioration or habilitation of the MDO's condition is also an important goal. To that end, commitment "places an affirmative obligation on the treatment facility to provide treatment for the underlying causes of the person's mental disorder." (Pen. Code, § 2972, subd. (f).) Because commitment under Penal Code section 2972 is nonpunitive, the Legislature has further provided that "the person committed shall be considered to be an involuntary mental health patient" "entitled to those rights set forth in Article 7 . . . of Chapter 2 of Part 1 of Division 5 [sections 5325 through 5337] of the Welfare and Institutions Code [(hereafter article 7)]" (Pen. Code, § 2972, subd. (g)), which sets forth the legal and civil rights of persons involuntarily detained because of mental disorders.

Sections 5325 and 5325.1 set forth various rights of involuntary mental patients, but neither contains any reference to the right to refuse antipsychotic medication. The only provision addressing this question is section 5325.2, which expressly reserves "the right to refuse treatment with antipsychotic

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

medication," but only to those persons "subject to detention pursuant to Section 5150, 5250, 5260, or 5270.15 . . . ." (See also § 5332.) The common thread of these latter statutes is that they govern short-term commitments—ranging from an initial 72-hour evaluation to 14- and 30-day periods of intensive treatment—of persons who are gravely disabled, chronic alcoholics, or believed to be a danger to self or others. The purpose of these limited commitments is to evaluate the nature of the person's mental disorder, stabilize his or her condition, and determine whether further confinement and treatment are necessary. Therefore, although the LPS Act may incorporate the general common law right to refuse medical treatment (see *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303 [271 Cal.Rptr. 199]), it expressly limits that right with respect to antipsychotic medication.

Conspicuously absent from the enumeration in Welfare and Institutions Code section 5325.2 are MDO's. The reason is readily apparent: Pursuant to Penal Code section 2972, MDO's have already been committed for one year under standards and procedures that have identified the nature of their disorder and confined them specifically for treatment thereof. (See generally, Pen. Code, § 2960.) Since Penal Code section 2972, subdivision (g), incorporates only those rights set forth in article 7 of the LPS Act, and article 7 accords the right to refuse antipsychotic medication only to certain short-term committees, the conclusion is inescapable that MDO's do not have that prerogative. Since they cannot refuse this medication, the question of their competency is moot. (Cf. Welf. & Inst. Code, § 5332.)

The majority concludes otherwise based on a free-ranging and circuitous foray well outside the designated confines of article 7 of the LPS Act. First, the majority determines that "the reasoning of *Riese* [*v. St. Mary's Hospital & Medical Center, supra*, 209 Cal.App.3d 1303] makes clear that the right [to refuse antipsychotic medication] does not apply solely to short-term LPS patients." (Maj. opn., *ante*, at p. 18.) The legislative chronology does not bear out this assertion. *Riese* was decided in 1987, four years before the enactment of section 5325.2. (See Stats. 1991, ch. 681, § 2, p. 3078.) While it is not entirely clear whether the Legislature was reacting to the holding in *Riese* that persons involuntarily detained under the LPS Act have the right to refuse antipsychotic medication, it is clear that such right is now statutorily limited to short-term involuntary detainees. A contrary finding defies statutory language that could hardly be more explicit. Moreover, *Riese* was decided two years after the language incorporating article 7 of the LPS Act into the MDO Act. (See Stats. 1985, ch. 1418, § 1, pp. 5009–5011.) The Legislature thus would have had no reason to understand it was impliedly according MDO's the right to refuse antipsychotic medication.

The majority's discussion of section 5300 is equally off point. That section applies to another specific class of detainees—those who, after a 14-day period of intensive treatment pursuant to section 5250, may be further confined for treatment up to 180 days longer upon a finding of dangerousness as defined in the statute. In addition to the fact that section 5300 does not appear in article 7 of the LPS Act, this provision simply has no relevance to MDO's who are committed under an independent statutory scheme, with its own definitional criteria. To the extent Welfare and Institutions Code section 5300 has any significance, it underscores the implicit nexus drawn by the Legislature between dangerousness and the denial of a right to refuse antipsychotic medication. By definition, MDO's have been found—at trial and beyond a reasonable doubt—to "represent[] a substantial danger of physical harm to others" by virtue of a "severe mental disorder." (Pen. Code, § 2972, subd. (c).) This standard is at least as exacting as Welfare and Institutions Code section 5300 and with greater procedural protections. Nonetheless, the majority's insistence that MDO's are entitled to an additional finding of dangerousness renders competing statutory schemes muddled and potentially conflicting, where heretofore they operated in complete harmony because each governed a distinct class of committees.

Equally unpersuasive is the implication that the majority's holding is necessary to conform the right of MDO's to refuse antipsychotic medication to that of non-MDO mentally ill state prisoners. (See *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526 [223 Cal.Rptr. 746].) Again, the majority has far exceeded the bounds expressly imposed by the Legislature in designating the rights of MDO's. The right of state prisoners in this regard derives from Penal Code section 2600, both its prior version as construed by the Court of Appeal in *Keyhea* and its current version as amended in conformance with the holding in *Keyhea*. In contrast, the rights of MDO's derive from Penal Code section 2972 and its incorporation of article 7 of the LPS Act. In reaching its conclusions regarding the rights of state prisoners, the *Keyhea* court did not reference article 7, but instead drew its comparisons from the statutory provisions governing LPS Act conservatees (Welf. & Inst. Code, § 5350 et seq.) and adult nonconservatees (Prob. Code, § 3200 et seq.). (*Keyhea*, at pp. 534–540.) By contrast, the Legislature confined the rights of MDO's to article 7 and, significantly, did not alter that designation when it revised Penal Code section 2600 to incorporate the *Keyhea* injunction.

The majority's holding also disregards a cardinal principle of statutory construction that courts must consider "the object to be achieved and the evil to be prevented by the legislation. [Citation.]" (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873].) One express purpose of the MDO Act is to provide MDO's "with an appropriate level of mental health treatment" initially while in prison and later upon release. (Pen. Code, § 2960.) Even outside the mental health

community, it is well recognized that for some individuals antipsychotic medication may be a necessary component of any effective treatment program. In giving control of that decision to the patient unless incompetent or dangerous within the meaning of Welfare and Institutions Code section 5300, the majority's holding not only upsets the treatment mechanism by preventing the attending mental health professionals from exercising their best judgment and discharging their duty "to provide treatment for the underlying causes of the person's mental disorder." (Pen. Code, § 2972, subd. (f).) The holding also makes it a virtual certainty that MDO's who choose to refuse appropriate and necessary medication will be warehoused indefinitely because their treatment program will likely be ineffective and thus fail to keep their mental disorder in remission. (See *id.*, § 2972, subd. (c).)

Moreover, the treatment of MDO's already has considerable oversight, in part, to protect against the misuse or overuse of antipsychotic medication. As counsel for the director of Napa State Hospital represented at oral argument, treatment programs are designed by a team of mental health professionals and are reviewed quarterly. MDO's may participate in the process if they desire and thus have the opportunity to provide input on the type and amount of antipsychotic medication. An independent internal review is also available on request. Those conducting the independent review are not part of the treatment team and therefore have no predetermined commitment to a particular medication regime. Counsel represented that on at least one occasion, the independent review resulted in a termination or modification of medication.

The authority of the State Department of Mental Health to adopt regulations to modify the rights of MDO's "as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held" (Pen. Code, § 2972, subd. (g)) does not ameliorate the negative impact of the majority's holding for several reasons. First, setting aside the time and effort in complying with the Administrative Procedures Act (see Gov. Code, § 11340 et seq.) that promulgation of such regulations would entail, the department's ability to formulate what would have to be "one size fits all" regulations is questionable. At the very least, the language of the MDO Act, which imposes a duty to treat the individual MDO, runs counter to the formulation of generic regulations regarding antipsychotic medication. Second, under the terms of Penal Code section 2972, subdivision (g), it is unclear on what basis the department would be able to justify such regulations as necessary to the security of every inpatient facility. (See Gov. Code, § 11342.2.) Third, any such justification would likely be based on circumstances that render an MDO dangerous within the meaning of Welfare and Institutions Code section 5300, in which case the right to refuse antipsychotic medication would terminate, rendering a regulation to the same effect superfluous. Fourth, imposing regulations reduces or eliminates the very

flexibility the current system depends upon to tailor treatment programs to the specific needs of each MDO and adjust treatment as warranted.

Sympathy for someone in respondent's circumstances is understandable; but that is not the question before the court. In enacting the MDO Act, the Legislature has taken into account, and balanced, not only sympathy for the MDO's plight but the additional, and ultimately more substantial, concerns for public safety and treatment of the MDO's mental disorder. Without justification or legal support and with at best limited knowledge of the practical circumstances, the majority has displaced that careful balance with a rule that may in the abstract seem fair and compassionate, but that is unworkable and unrealistic while undermining legislative intent. We also have no reason to believe treatment of MDO's, including the administration of antipsychotic medication, is not handled in accordance with the highest medical and legal standards as well as their best interests. I would, therefore, in this case more than ever, adhere closely to the statutory language and defer to the policy judgments of the Legislature.