Filed 3/4/15  State Dept. State Hospitals v. L.F. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Plaintiff and Respondent, | E060569 |
| v. | (Super.Ct.No. FELSS1303948) |
| L.F., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  James M. Dorr, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, and Richard T. Waldow and KristenT. Dalessio, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant L.F., a mentally disordered offender (MDO) as defined by Penal Code section 2960 et seq., appeals from an order authorizing plaintiff and respondent Department of State Hospitals, Patton State Hospital (Patton) to involuntarily administer psychotropic medications during L.F.'s treatment. He contends his due process rights have been violated because there is insufficient evidence to establish that (1) he meets the criteria for involuntary medication, and (2) he is dangerous due to his mental disorder. We reject his contentions and affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

L.F. has been diagnosed with schizophrenia, paranoid type. On March 7, 2012, he was certified as an MDO pursuant to the Mentally Disordered Offender Act (Pen. Code, § 2960, et seq.). Beginning on November 8, 2012, he was administered involuntary antipsychotic medications under an order rendered pursuant to *In re Qawi* (2004) 32 Cal.4th 1 (*Qawi*); however, the order was set to expire on November 8, 2013.[1] As a result, on September 13, 2013, Patton filed a verified petition seeking authorization to administer appropriate involuntary psychotropic medications to L.F. in the dosage and frequency deemed necessary. Counsel was appointed to represent L.F., and a hearing date was set, which was later continued to December 13, 2013.

On December 13, 2013, the trial court conducted a *Qawi* hearing. Both L.F. and his treating psychiatrist, Dr. Steven Galarza, testified. According to Dr. Galarza's testimony, he is a staff psychiatrist at Patton and has been L.F.'s treating psychiatrist

---

[1] The parties stipulated to continue the order to December 13, 2013.

2

since fall 2012. L.F. was, and remains, diagnosed with schizophrenia, paranoid type, characterized by debilitating symptoms, including "a significant history of delusions, hallucinations . . . causing a significant impairment in functioning." L.F. "believes that people want to poison him, harm him, attack him, kill him." He also suffers from delusions that he is a "descendent of someone important," he has "millions of dollars," the "members of the state hospital such as [Dr. Galarza] . . . are Nazis," "judges are pirates," and he is being kept against his will.

Although L.F. is currently under a court order that allows Patton to involuntarily medicate him, on occasion he refuses his medication, requiring the staff to "check his mouth to make sure he has swallowed the medication." When he is on his medications, he is "less paranoid" and "less aggressive." In contrast, when he refuses to take them, he "show[s] an increase in psychotic and aggressive symptoms." Without an involuntary medication order, Patton is unable to prevent L.F. from refusing his medication.

Although Dr. Galarza acknowledged that the medications L.F. needs may have side effects,[2] the doctor explained that he has chosen medications with the least side effects. Those medications have improved L.F.'s physical well-being, causing him to lose weight. Also, L.F. has "shown a greater participation in groups" while under treatment of the medications. To the extent L.F. experienced any significant side effects from taking the medications, Dr. Galarza would "lower the dose and look for alternatives [or] switch his medication around."

---

[2] Such side effects include weight gain, causing diabetes, high blood pressure and cholesterol problems, and decrease in white blood cell count.

Based upon his discussions with and observations of L.F., along with examination of L.F.'s records, Dr. Galarza opined that L.F. does not have the capacity to effectively weigh the risks and the benefits of medication. L.F. "would choose to stop medications," which would "dramatically escalate" his paranoid, aggressive symptoms. According to Dr. Galarza, even under the safety of Patton, L.F. "has been unable to control some of his behaviors." To illustrate his concern, Dr. Galarza described an incident that occurred on November 24, 2013, a few weeks before the *Qawi* hearing. When another patient stepped on L.F.'s toe, L.F. hit the patient, injuring him. Both L.F. and the other patient were evaluated by the physicians, and the other patient's injuries were consistent with a "hard hit." Such assaultive behavior is consistent with L.F.'s paranoid feelings that he is under attack. More frequently, L.F. is verbally assaultive to staff members, "using racial terms and verbiage that's frankly threatening," while using his hand to mimic the use of a gun. Thus, Dr. Galarza opined that if the *Qawi* order is not extended, L.F. would present a danger to staff and other patients at Patton.

According to L.F.'s testimony, he does not want to take the medications, stating "it's bad for my body, and I want the right to choose not to take [them]." When asked about the incident in November 2013, L.F. explained, "I can't let people just assault me and abuse me and get away with it." L.F. opined that Patton wanted to medicate him because they wanted to "alter" his mind. He stated: "They want to control my mind . . . and then . . . rehabilitate my mind and my brain . . . and send me to school and teach me new things and rehabilitate me into the community." L.F. admitted that he has schizophrenia, but he opined that he could deal with his delusions with counseling. If

4

given the choice, he would not take the medications. He complained that because he had taken Zyprexa, he is now diabetic and must take insulin every day. Dr. Galarza never prescribed Zyprexa for L.F.

At the conclusion of the hearing, the trial court found that L.F. was incompetent and a danger to others, and ordered Patton to administer the necessary psychotropic medication involuntarily to L.F.

## II. DISCUSSION

### A. Applicable Law

Individuals in custody may refuse to take psychotropic medication. (*Qawi*, *supra*, 32 Cal.4th at p. 14.) However, the right of a person committed as an MDO "to refuse antipsychotic drugs is qualified . . . ." (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1013.) Such right of refusal may be overcome by a judicial determination that (1) the MDO is incompetent or incapable of making decisions about his or her medical treatment, or (2) the MDO is dangerous within the meaning of Welfare and Institutions Code section 5300. (*Qawi*, *supra*, at p. 27.)

"We review an order authorizing involuntary administration of antipsychotic medication for substantial evidence. [Citation.]" (*People v. Fisher*, *supra*, 172 Cal.App.4th at p. 1016.)

### B. Substantial Evidence Supports the Trial Court's Finding that L.F. is Incompetent or Incapable of Making Decisions About His Medical Treatment

L.F. argues the evidence is insufficient to show that he is incompetent. We disagree.

5

Judicial determination of whether an MDO is competent to refuse antipsychotic medication focuses on three factors: (1) whether the patient is aware of his situation; (2) whether the patient understands the benefits and risks of the treatment; and (3) whether the patient is able to understand and knowingly, intelligently, and rationally evaluate and participate in the treatment decision. (*Qawi*, *supra*, 32 Cal.4th at pp. 17-18.) Here, there is substantial evidence that these factors each weigh in support of the trial court's finding.

The evidence and all reasonable inferences therefrom support the trial court's determination of incapacity. Dr. Galarza testified that L.F. suffers from delusions that are "grandiose," believing that he is a "descendant of someone important"; he has "millions of dollars"; Patton's staff members are "Nazis"; and judges are "pirates." The doctor stated that such delusions cause a "significant impairment in [L.F.'s] functioning." While L.F. points out that he acknowledged he has schizophrenia, such acknowledgment is irrelevant to whether the court's decision is supported by substantial evidence. In deciding the sufficiency of the evidence, we draw all reasonable inferences from the record to support the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We do not weigh the evidence or decide the credibility of the witnesses. (*Ibid.*)

Dr. Galarza testified that Patton's staff members have attempted to educate L.F. about his need for medication and the desired treatment course; however, L.F. remains unreceptive to the benefits of medication and his "insight remains limited and superficial." While under court order to take his medication, L.F. refused, requiring staff to intervene and confirm that he had done so. Dr. Galarza pointed out that L.F.

6

demonstrates symptoms of paranoia and delusions (believing the hospital staff is out to harm him and his prescribed medication is poisoning him) while on medication, and opined that such symptoms would escalate without the medication.  Thus, L.F. benefits from the medication.  Nonetheless, he argues that he understands the benefits and risks of treatment as evidenced by his testimony that his current medications "poison" him, he contracted diabetes when he was prescribed Zyprexa, and he is willing to participate in counseling as a means of treatment.  However, L.F. is not currently being prescribed Zyprexa and the side effects of his medications have been more positive than negative.  Moreover, L.F. believes that Patton staff wants to medicate him in order to "control" or "alter" his mind.  Thus, if given the choice, he would not take the medication.  Based on the record before this court, the evidence supports a finding that L.F. was unable to understand the benefits and risks of medication and was unable to evaluate the proposed treatment.

## C.  Substantial Evidence Supports the Trial Court's Finding that L.F. Is Dangerous

L.F. asserts that complaints of foul language or conclusory statements about events that took place over a year ago are insufficient to show that he poses a "demonstrated danger."  He argues that his psychotic symptoms (irritability, grandiosity, and belief that Patton staff members are pirates) failed to indicate a physical danger to others.  Additionally, he submits that the one incident where he hit a patient who had stepped on his toe is better characterized as an act of self-defense rather than a product of his mental disorder.  We are not persuaded.

7

In order for a trial court to determine an MDO to be a danger to others, Welfare and Institutions Code section 5300 requires "two types of findings of dangerousness." (*Qawi*, *supra*, 32 Cal.4th at p. 20.)  In addition to a finding of "'demonstrated danger' to others" as a result of mental disorder, Welfare and Institutions Code section 5300 "requires a finding of recent dangerousness as evidenced by tangible acts or threats of violence." (*Qawi*, *supra*, at pp. 20, 24.)  "Demonstrated danger may be based on assessment of present mental condition, which is based upon a consideration of past behavior of the person within six years prior to the time the person attempted, inflicted, or threatened physical harm upon another, and other relevant evidence." (Welf. & Inst. Code, § 5300.5, subd. (c).)  A finding of recent dangerousness may consist of violent or threatening acts specified in section 5300 within the year prior to the commitment or recommitment.  (*Qawi*, *supra*, at p. 28, fn. 7.)

The record contains substantial evidence of both types of dangerousness. Dr. Galarza described several incidents in which L.F. inflicted, attempted to inflict, and threatened to inflict substantial physical harm on others.  The trial court could reasonably infer that hitting another patient constitutes the infliction or attempted infliction of substantial physical harm, even if L.F. claimed self defense.  According to Dr. Galarza's expert opinion, L.F. "feels like people are focusing on him.  He misinterprets social cues and feels he's under attack and he will react."  Because this incident occurred merely weeks before the *Qawi* hearing, it occurred during his most recent term of commitment.

The trial court could also infer that L.F.'s gesture of mimicking the use of a gun while threatening to shoot Patton's staff members was a serious threat of substantial

8

physical harm. Dr. Galarza testified that "[v]ery frequently [L.F.] verbally assaults staff on my unit using racial terms and verbiage that's frankly threatening." The doctor observed that even with Patton's 24-hour-a-day monitoring and safety measures, L.F. "had been unable to control some of his behaviors," causing Dr. Galarza to fear that "off medications, these behaviors will be very dangerous actually."

We conclude the record contains substantial evidence that L.F. poses a "demonstrated danger," given his history of unprovoked assaultive behavior since being treated at Patton.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                          HOLLENHORST
                                                     J.

We concur:


RAMIREZ
                      P.J.

MCKINSTER
                      J.