Filed 5/26/21 In re A.R. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | B306563 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP02783A) |
| Plaintiff and Respondent, | |
| v. | |
| A.C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge. Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

A.C. (Father) appeals from a juvenile court dependency jurisdiction finding concerning his son A.R. (Minor), as well as an order removing Minor from Father's and R.R.'s (Mother's) custody. The juvenile court found Minor was at substantial risk of serious physical harm from Father's history of mental and emotional problems and Mother's willingness to permit Father to reside in the home and have unlimited access to Minor. Mother has not appealed from the juvenile court's jurisdiction finding and disposition order, but Father asks us to decide whether substantial evidence supports both. He also argues the juvenile court erred in considering assertedly privileged statements made by hospital personnel during Father's involuntary psychiatric hospitalization, but, as we will explain, that is an issue we need not resolve.

## I. BACKGROUND

### A. *The Referral Regarding Father's Mental Health*

On the evening of May 8, 2020, the Los Angeles County Department of Children and Family Services (the Department) responded to a referral alleging general neglect of Minor, who was seven years old at the time. According to the reporting party, a man (later identified as Father) had been running in and out of the street, throwing water bottles at cars, and masturbating in public.

A Department social worker arrived on the scene and observed a man standing in the street waving and yelling at cars. The social worker requested assistance from law enforcement before approaching Mother's duplex-style apartment. A psychiatric social worker from the Department of Mental Health was also present on the scene when the police arrived. She found

2

Father's behavior to be "'bizarre, agitated, and paranoid'" and she observed Father "yelling at the officers with hopes of intimidating them." When she tried to engage with Father, he was "very delusional and . . . not making sense in his statements."

When the Department social worker, accompanied by police officers, knocked on the door of the apartment where Minor and his parents were living, Mother and Father refused to let them in. When the social worker explained (through the door) that she wanted to speak with Minor, Father brought Minor to a window and permitted the social worker to speak with him only through the window. Minor told the social worker he felt safe, was not afraid of Mother or Father, and denied any verbal, physical, or sexual abuse. As far as the social worker could tell from the conversation through the window, Minor appeared calm and in good health and good spirits.

Father, however, became increasingly hostile during the social worker's conversation with Minor and began directing "racial slurs" toward the social worker and the accompanying officers. The social worker and the police officers, on the officers' recommendation, left the immediate area in an effort to avoid any further escalation in light of Father's mounting anger (he had come outside the home and was yelling at them from the street when they were no longer near the apartment door).

The following day, May 9, 2020, another Department social worker and an accompanying police officer returned to the home and attempted to interview Mother and Father. They again refused to open the door and Father became "very vulgar" toward the social worker and the accompanying officer. Father also issued a not-so-veiled threat, telling the social worker and the police officer that if they tried "'to come in here, I have something

3

waiting for you guys.'" The officer advised the social worker to move away from the apartment's front door, and, after the officer consulted with a police department supervisor, both left the area.

The assigned social worker continued to investigate Minor's welfare by speaking to two neighboring tenants (otherwise unidentified by the Department's reporting) in Mother's apartment building. Both neighbors stated they had heard yelling and profanity from the home of the family, and one of the neighbors reported hearing Mother hitting Minor on two occasions. Neither neighbor, however, reported seeing any bruises or unusual marks on Minor. The social worker also reported receiving "criminal docket" information for Father that revealed he underwent "mental competency proceedings in criminal [c]ourt in 2019[ ] in relation to a conviction for battery/assault."[1]

###### B. *Father's Involuntary Hospitalization and Further Department Investigation*

Four days after the last visit by the police and the social worker to Mother and Father's home, i.e., on May 13, 2020, the police had Father involuntarily hospitalized at Huntington Hospital pursuant to section 5150 of the Welfare and Institutions Code. That statute permits taking a person into custody for up to 72 hours for "assessment, evaluation, and crisis intervention" when there is probable cause the "person, as a result of a mental

---

[1] The Department was ultimately unable to obtain documents from the criminal case detailing the competency proceedings.

4

health disorder, is a danger to others, or to himself or herself, or gravely disabled." (Welf. & Inst. Code,[2] § 5150, subd. (a).)

While Father was being held involuntarily, a Department social worker interviewed Mother. She acknowledged Father was yelling and "behaving awkwardly" when police and a social worker first visited the family home on May 8th, but Mother explained she did not open the door for law enforcement because "she did not want to hear [F]ather's mouth." As Mother put it, "'That was his issue and I did not want to be in it.'" Mother also expressed more general frustrations with the police department because she said she previously contacted the police when Father's behavior was "manic" and yet the police refused to help; according to Mother, her last call to the police was about three weeks earlier when Father was screaming at her.[3] Mother attributed Father's recent behavior to increased stress, but when asked if Father had mental health problems or took psychotropic medication, Mother denied that he did.[4] She also denied Father

---

[2]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

[3]    According to police department records reviewed by the Department, Mother called law enforcement on April 4, 2020, and reported Father was screaming at her and she wanted him to leave.

[4]    When asked about her plans when Father was discharged from the hospital, however, Mother said she would not allow him to return to the home if he does not take "his medication."

ever physically assaulted her and she claimed she was not fearful of Father (though she did concede he "verbally assaults" her).[5]

The social worker also interviewed Minor (Mother was present during the interview). When Minor was asked if he knew why the social worker wanted to talk to him, he said "'[Father] was arrested, in my opinion he was arrested for no reason.'" Asked specifically about what occurred on May 8th (the day the Department first visited the family home), Minor said Father was upset and yelling but Minor did not know why. Minor also told the interviewing social worker that Father yells at Mother often, but Minor again said he did not know why. Minor denied being fearful of either parent, however, and he said he never saw domestic violence between the two. He also denied being physically disciplined by his parents and denied "all forms of abuse and neglect."

A Department social worker communicated with personnel at the hospital where Father was being held for evaluation (these communications would be the subject of Father's later claim of privilege). The day after Father's admission, an employee of the hospital's "psych unit" said Father had been behaving erratically and would yell when spoken to, but there was no diagnosis yet because he had not been seen by a psychiatrist. The following day, the hospital social worker overseeing Father's care informed the Department that Father had been assessed by a "Dr. Kurkjian" and given a primary diagnosis of psychosis with a secondary diagnosis of bipolar disorder with psychotic features. The social worker said hospital personnel had offered medication

---

[5]    In the social worker's judgment, Mother was "very protective" of Father and "minimize[d]" his behavior.

to Father, but he refused to take it. The hospital social worker
further advised that Father's 72-hour involuntary hold could be
extended if medical personnel found it necessary based on his
progress or lack thereof.[6]

Father was held for longer than the 72 hours permitted by
section 5150: he was discharged from the hospital on May 19,
2020, i.e., six days after being admitted. Later that same day,
the Department obtained a warrant to remove Minor from his
parents' custody. When the police and Department social
workers arrived at the family home to execute the removal
warrant, the parents initially refused access to Minor, but they
eventually relented—though Father cursed and yelled profanities
at the social workers and police officers.

Once removed from his parents' custody, Minor spoke with
a social worker and said he had felt safe with his parents. He
revealed, however, that Mother and Father often argued and
Mother would "tape[ ] the holes in the apartment walls" because
she believed there were cameras and microphones in the
apartment. In some contrast to his statement during a prior
interview in Mother's presence, Minor revealed his parents did

---

[6]     After the 72-hour period authorized by section 5150, a
person may be certified for up to 14 additional days of intensive
treatment if the professional staff of a hospital or facility has
analyzed the person's condition and has found the person is, as a
result of a mental health disorder, a danger to himself or others,
or gravely disabled, and the person is unwilling or unable to
accept treatment on a voluntary basis. (§ 5250; see generally *In
re Qawi* (2004) 32 Cal.4th 1, 16 [describing a series of
increasingly lengthy periods of detention following an initial 72-
hour commitment which are "'implemented incrementally'"].)

physically discipline him on occasion but he said "they don't do it a lot." Minor also stated he would view his time in foster care as a "vacation" for his parents because he frequently made them mad. Minor did not elaborate.

### C. The Petition and Post-Detention Investigation

In May 2020, the Department filed a two-count dependency petition alleging Minor was at substantial risk of suffering serious physical harm as a result of his parents' failure or inability to adequately supervise or protect him. Count b-1 of the petition alleged Father had a history of mental and emotional problems, including a diagnosis of Psychosis and Bi-Polar Disorder with psychotic features, that placed Minor at risk of harm and Mother "knew of [Father's] mental and emotional problems and failed to protect [Minor] in that [Mother] allowed [Father] to reside in [Minor's] home and to have unlimited access to [Minor]." Count b-2 of the petition alleged Minor was at risk of harm from Father's abuse of marijuana and Mother's tolerance of that abuse in Minor's presence.

At an initial detention hearing, Father denied the petition's allegations and objected to various statements in the Department's detention report, including the statements by hospital personnel discussing Father's mental health. The juvenile court ordered Minor detained from his parents and preserved Father's evidentiary objections for a jurisdiction hearing to be held later.

In advance of that hearing, the Department re-interviewed Mother and Minor. Mother described Father as being a "good father to [Minor]" and denied being told by any doctor that Father had been diagnosed with any mental condition; she said

8

she only learned of a diagnosis of mental illness from the Department. In connection with the public masturbation that was described by the original referring party, Mother said Father had a hernia and needs to "adjust himself quite frankly a lot." Mother also told the Department that Father was no longer living in her home and was staying instead at nearby motels.

In his follow-up interview, Minor told the Department's investigator that Father sometimes talks to himself. Minor also described an instance when Father got "super duper mad" at a delivery driver and threw an object at the driver (Minor did not see what the object was). In addition, Minor said he "can't explain too much" and believed the police came to his home because he was playing cops and robbers with his stuffed animals.

The Department attempted repeatedly to interview Father but ultimately the dependency investigator was able to communicate with him only through text messages. In several of his text messages, Father accused the Department of "kidnapping" Minor, having a "conflict of interest," engaging in "civil harassment," and being an "indian god." One of the messages complained of the Department's "defective incomplete paperwork, which has no legal seals" and informed the Department that the paperwork had been "forwarded to federal agency."

With its jurisdiction report to the juvenile court, the Department submitted a copy of the discharge papers from Father's involuntary hospitalization. While portions of the discharge paperwork are legible, including the results of laboratory tests and the directions regarding a medication that Father was taking (naproxen) before admission, other portions,

including the "discharge home medications," are almost entirely illegible. The section devoted to follow-up plans with Father's primary care physician and other health care providers appear blank. The discharge papers, to the extent they are legible, do not refer to Father's diagnosis or discuss Father's communications with his psychotherapist or his psychotherapist's advice.

Prior to the adjudication hearing, Mother and Father filed written objections to various statements in the Department's reports. Mother's objection was general in nature.[7] Father principally argued the medical records and statements made by or attributed to medical professionals charged with his care during his section 5150 hold were protected by the psychotherapist-patient privilege and should be excluded. In opposition, the Department argued the psychotherapist-patient privilege did not apply because Father was evaluated involuntarily pursuant to section 5150, which meant he was not a "patient" within the meaning of the privilege. The Department also argued the court had the authority to permit disclosure of Father's medical records under section 5328 because they were relevant to investigation and prevention of child abuse and neglect.

### D.    *Adjudication and Disposition*

The juvenile court held a jurisdiction and disposition hearing in July 2020. With regard to the parents' evidentiary

---

[7]    During the later jurisdiction hearing, Mother's attorney clarified that her objection was to the hearsay statements of her neighbors found in the Department's detention report.

objections, the court ruled it would admit the statements of the unnamed witnesses (the reporting party and Mother's neighbors) but accord them "little to no weight" due to the absence of any corroborating evidence. The court also ruled that it would not give "any weight" to statements in the Department reports about Father's criminal history, including the aforementioned mental competency proceedings, because the Department did not provide the court with certified copies of documents from the criminal case. The juvenile court ruled the statements by hospital personnel and the hospital discharge paperwork would be admitted in evidence because section 5328 permitted the disclosure of such information, including "privileged communication[s]," and Father's right to confidentiality was outweighed by the need to investigate the risk to Minor's welfare.

The court otherwise admitted the Department's reports in evidence and also admitted exhibits offered by Mother, including a certificate of outstanding engagement Minor received from his school and a letter from his teacher. In her letter, the teacher described Minor as a "wonderful student who is very inquisitive and loves participating," "gets along with all of the other students," and "make[s] even the shyest of kids feel comfortable."

After hearing argument, the juvenile court dismissed the petition's b-2 substance abuse count and sustained the b-1 mental and emotional problems count after amendments by interlineation. With its amendments, the court added language to indicate Father was hospitalized pursuant to a section 5150 hold; struck language stating Father fondled his genitals in public, threw water bottles at cars, and made delusional statements; and limited language concerning Father's inability to care for Minor so it referred to the existence of that inability only

11

"at times."[8]  Explaining its decision to sustain the b-1 count as amended, the juvenile court stated:  "[A]fter reviewing all the evidence and hearing the arguments of counsel, I do believe that the mental health condition and behaviors exhibited by [Father], and the impact it had on [Minor], does pose a physical risk to the child."  As for disposition, the juvenile court concurred with the position advocated by the Department and Minor's attorney and ordered Minor removed from his parents' custody and care.

## II.  DISCUSSION

Mother does not appeal from the juvenile court's orders, which means our resolution of this appeal will not disturb the juvenile court's jurisdiction over Minor.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.)  Nevertheless, in light of the interrelated factual basis for the finding of jurisdiction against both Mother and Father, we will discuss the reasons why we believe the jurisdiction finding is sound even assuming the juvenile court should have granted

---

[8]      As amended, count b-1 reads:  "[Father] has a history of mental and emotional problems, including a diagnosis of Psychosis and Bi-Polar Disorder with psychotic features which renders [Father] at times unable to provide regular care of the child.  On 05/13/2020, [Father] was hospitalized on a 5150 hold for the evaluation and treatment of [Father's] psychiatric condition.  [Mother] knew of [Father's] mental and emotional problems and was unable to protect the child in that Mother allowed [Father] to reside in the child's home and to have unlimited access to the child.  Such mental and emotional condition on the part of [Father] and [Mother's] failure to protect the child endanger the child's physical health and safety, and places the child at risk of serious physical harm . . . ."

12

Father's request to exclude the statements by hospital personnel and his hospital discharge paperwork.

In short, what truly matters is how mental and emotional problems manifest, not any specific psychiatric diagnosis. Here, there is strong evidence Father was suffering from mental and emotional problems that placed Minor at substantial risk of suffering serious physical harm: the involuntary section 5150 psychiatric hold, plus the extension of that hold beyond three days by hospital staff; the observations of Father's erratic, "delusional," and threatening behavior by law enforcement and the mental health social worker; and Mother and Minor's statements about Father's aggressive and, at and least in one instance, violent behavior at home. The strength of this evidence dispels any reasonable probability the juvenile court would have come to a different conclusion absent consideration of the assertedly privileged information and provides ample grounds for the assumption of jurisdiction. This same evidence, combined with Mother's inability or unwillingness to take corrective measures, also establishes the requisite basis for the juvenile court's decision to remove Minor from his parents' custody.

### A. Reversal of the Jurisdiction Finding Is Unwarranted

Section 300, subdivision (b)(1) authorizes a juvenile court to assume dependency jurisdiction over a child when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." Father argues the juvenile court's jurisdiction finding is infirm because the court erred in admitting the hospital personnel communications he contends are

13

privileged—and even with those communications, there was insufficient evidence to satisfy section 300, subdivision (b)(1). Assuming just for argument's sake that Father is right about the evidentiary error, the ruling was harmless in light of the relative strength of the other un-objected-to evidence (see generally *In re Celine R.* (2003) 31 Cal.4th 45, 59-60; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 134-135)—and that, of course, means there is substantial evidence supporting the jurisdiction ruling (see generally *In re R.T.* (2017) 3 Cal.5th 622, 633).[9]

As Father himself recognizes in his opening brief, the mere fact a parent is diagnosed with a mental illness does not provide sufficient grounds to presume the parent's child is at risk of harm attributable to that illness. (See, e.g., *In re A.L.* (2017) 18 Cal.App.5th 1044, 1050 ["the law is settled that harm may not be presumed from the mere fact of a parent's mental illness"].) That means, however, that the hospital social worker's disclosure of Father's diagnosis to the Department is not particularly probative of whether Minor is a child described by section 300 and the disclosure could not have played a prominent role in the juvenile court's assumption of jurisdiction. The true question is instead, as Father himself again puts it, "whether the parent's mental illness and resulting behavior adversely affects the [parent's] child or jeopardizes the child's safety. (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1079.)" There is good evidence, apart from the purportedly privileged communications from hospital personnel, that this is indeed the case.

---

[9]     For analytical purposes, we also do not rely on evidence about which the trial court stated it was giving little weight or no weight.

Father did not object to the juvenile court's consideration of the fact of his involuntary hold at Huntington Hospital, nor could he; that fact is not within the scope of the psychotherapist-patient privilege. The juvenile court amended the dependency petition to make explicit reference to that involuntary hospitalization and understandably so—it speaks volumes under the circumstances. As we have already described, Father could be held at the hospital for 72 hours under section 5150 only if there were probable cause to believe he was a danger to himself or others, or gravely disabled. Further, to extend such an involuntary hold beyond 72 hours under section 5250, the professional staff at the hospital must have confirmed—after evaluation—that Father, as a result of a mental health disorder, was a danger to himself or others, or gravely disabled. Father's involuntary admission to the hospital is thus evidence that he was suffering from a non-trivial mental illness at the time, and possibly an illness that posed a danger to himself or others.

Added to this evidence were the observations of those who saw Father engaging in bizzare, delusional, and threatening behavior before his involuntary hospitalization. The psychiatric social worker from the Department of Mental Health characterized Father's behavior as bizarre and paranoid, and she opined Father was yelling at police officers in a seeming attempt to intimidate them. In addition, when the psychiatric social worker attempted to engage with Father, he was "very delusional and . . . not making sense in his statements." The psychiatric social worker's assessment was consistent with the observations a police officer on the scene who similarly characterized Father's behavior as erratic and with the Department's social worker who saw Father standing in the street yelling at cars. Moreover,

15

when the Department's social worker and an accompanying police officer later knocked on Father's door to check on Minor's welfare, Father refused to open the door and said he had "something waiting for" the officer and the social worker if they tried to enter. This threat was especially revealing for purposes of deciding whether jurisdiction over Minor was warranted: Minor (or another child) was present in the apartment at the time, and Father's threat evidenced a willingness (bordering on eagerness) to engage in a violent confrontation (perhaps with a weapon) in the presence of a child.

Added to all that were the statements made by Mother and Minor that suggested Father's aggression and instability were common in the family home and directed at least at Mother. Mother acknowledged Father's "manic" behavior toward her had been concerning enough that she called the police in the recent past, and Minor confirmed Father would yell at Mother often. Mother attributed Father's "awkward[ ]" behavior to increased stress, and though she denied at one point that he took psychotropic medication, she at another point said she would not allow him back in the home unless he was taking his medication. Minor also revealed, without being willing to elaborate, that his parents physically disciplined him on occasion and stated he would view his time in foster care as a "vacation" for his parents because he frequently made them mad. Minor acknowledged Father would talk to himself sometimes, and more significantly, Minor related the incident when Father became so angry with a delivery driver that Father threw something at the driver.

With all of this evidence of mental and emotional problems that manifested in bizarre actions, threats, screaming, calls to the police, involuntary hospitalization, and at least in one

16

instance violent behavior, we see no reasonable probability the court would not have found jurisdiction if it had excluded the hospital's diagnosis of Father and his discharge paperwork. Rather, there is strong evidence (that well exceeds the deferential substantial evidence threshold) that the court would have taken jurisdiction rather than waiting for Father's mental and emotional condition to deteriorate to the point where Minor would suffer serious physical harm.  (*In re I.J.* (2013) 56 Cal.4th 766, 773 [a juvenile court "'need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child'"]; accord, *Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104 ["'The purpose of dependency proceedings is to prevent risk, not ignore it'"].)

> B.     *Substantial Evidence Supports the Removal Order*

Under section 361, subdivision (c)(1), a dependent child may not be removed from a parent unless the juvenile court finds "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)  "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.' [Citation.]  The court may consider a parent's past conduct as well as present circumstances."  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169- 170.)  We review a removal order for substantial evidence.  (*In re*

17

*Christopher R.* (2014) 225 Cal.App.4th 1210, 1216; see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

The juvenile court's decision to refrain from placing Minor with either parent is supported by substantial evidence. As just detailed, Father has unresolved mental and emotional problems that raise the requisite substantial danger. Mother's conduct left no reason to believe she could or would do anything to mitigate this danger. When directly asked whether Father suffered from any mental or emotional problems, Mother denied it and made excuses for him. She also continued to have contact with Father and allowed him to have unlimited access to Minor even after prior calls to the police and witnessing his behavior with social workers and police officers—remarking at one point that Father's confrontational, paranoid behavior was "'his issue and [she] did not want to be in it.'" In other words, there was every reason to believe Mother would continue to have contact with Father and little if any reason to believe that she would protect Minor's physical and emotional well-being without Department intervention and court-ordered services.

DISPOSITION

The juvenile court's jurisdiction findings and disposition order are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.