Filed 1/19/22  P. v. Gordon CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079044 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD119643) |
| CALVIN GLENN GORDON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Jay M. Bloom, Judge.  Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Calvin Glenn Gordon has been adjudged a mentally disordered offender (MDO) and committed to the Department of State Hospitals (DSH) since 2002.  He appeals from an order granting the People's

petition to extend his commitment for one year pursuant to the Mentally Disordered Offender Act (MDO Act). (Pen. Code,[1] § 2960 et seq.) Gordon argues substantial evidence does not support the trial court's finding that he presents a substantial danger of physical harm to others. For reasons we will explain, we disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Commitment Offense*

In March 1996, Gordon, 39 years old at the time, was observed pacing back and forth on an overpass and waving his arms. Gordon then bent down, picked up a 12"-18" metal water meter cover, and threw it onto the southbound lanes of the freeway below. A motorist who witnessed this was forced to change lanes to avoid being hit. Gordon was soon identified by bystanders and arrested. Upon arrest, a glass cocaine pipe was found in his pants pocket.

Gordon was charged with throwing a substance at a vehicle (Veh. Code, § 23110, subd. (b)) and assault upon another with a deadly weapon and by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), with an enhancement that he personally used a deadly weapon (Pen. Code, § 1192.7, subd. (c)(23)). Gordon pleaded guilty in May 1996 to assault with a deadly weapon and admitted the personal use enhancement. He was placed on three years of formal probation in June 1996. Probation was later revoked after he violated it, and he was sentenced in September 1997 to three years in state prison.

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

2

B.      *Commitment as a Mentally Disordered Offender*

After Gordon completed serving his sentence, he was paroled and committed to Atascadero State Hospital pursuant to section 2962[2] as an MDO.  He was later transferred to DSH in Patton, California (DSH-Patton), where he remains to this day.  Gordon's commitment has been extended annually on petition by the People.  His most recent commitment expired on May 24, 2021.

C.      *The People's 2021 Petition for Recommitment*

On January 15, 2021, the People filed another petition for recommitment for a period of one year.  Upon Gordon's entry of a denial, the trial court appointed two doctors—Dr. David Bloch and Dr. Randy Stotland— to evaluate whether Gordon meets the criteria for continued commitment.

Gordon waived his right to a jury trial.  Accordingly, the trial court held a bench trial on May 24 and May 27, 2021.  The People called three witnesses:  Dr. Bloch, Dr. Stotland, and Dr. Ryan Jordan.  No documentary evidence was entered, and the defense did not call any witnesses.

---

[2]      Section 2962 sets forth the following criteria that must be met for a prisoner to be deemed an MDO:  (1) they have a severe mental disorder that is not in remission or cannot be kept in remission without treatment; (2) the severe mental health disorder was a cause of or an aggravating factor in the prisoner's original commitment offense; (3) the prisoner has been in treatment for the disorder for 90 days or more in the year preceding release on parole; (4) a treating physician and other specified medical authorities certify that each of the noted conditions exists, and that by reason of the disorder, the prisoner "represents a substantial danger of physical harm to others"; and (5) the prisoner received a determinate sentence and the commitment offense is one listed in section 2962, subdivision (e)(2).  (§ 2962, subds. (a)–(e).)

3

1.	*Dr. David Bloch*

Dr. Bloch is a forensic and clinical psychologist. His testimony was based on an interview with Gordon and a review of Gordon's medical records, certified criminal rap sheet, and probation report. Dr. Bloch also spoke to Gordon's social worker.

Dr. Bloch opined that Gordon has schizophrenia, a severe mental disorder characterized by alterations of perception of reality, hallucinations, delusions, as well as distorted, confused, and disorganized thinking.[3] Dr. Bloch further opined that Gordon's schizophrenia was not in remission because he continued to have symptoms of his mental illness. Lastly, Dr. Bloch believed that Gordon represented a substantial danger of physical harm to others.

Underlying Dr. Bloch's opinions was Gordon's presentation of "fairly severe consistent paranoid delusions." For decades, Gordon has believed that a man named "Mr. Ardsell" has been playing "The Game" whereby he tries to control Gordon's life, cause him harm, and make him a homosexual. Gordon claimed that Mr. Ardsell framed him for his commitment offense. Denying that he threw the metal cover to harm anyone, Gordon told Dr. Bloch that he was simply trying to get the police's attention so that they could help him with Mr. Ardsell. Based on these statements, Dr. Bloch opined that Gordon was experiencing symptoms of schizophrenia at the time of the offense.

Mr. Ardsell plays a prominent role in Gordon's delusions. Gordon claimed Mr. Ardsell set him up for a prior arrest for carrying an assault rifle. Mr. Ardsell even sent Gordon a "subliminal message" to shoot a police officer

---

[3]	Dr. Bloch also described Gordon's thinking as "logical," though this appears to be a mistake as it is inconsistent with the determination that Gordon's thinking is distorted, confused, and disorganized.

during the course of that arrest, which Gordon declined to do. Further, Gordon told Dr. Bloch that a judge who handled a 2016 petition for recommitment was conspiring with others and that the psychiatrist who examined him "had an illegal game" with Mr. Ardsell. Similarly, Gordon believed Mr. Ardsell was responsible for Gordon's nephew's death in 1980.

Gordon's delusional thoughts extend to other matters, too. He believes he is a wealthy man in possession of millions of dollars. He claims the money was collected for him from Christian congregations all over the world because he "went through a lot of trouble with gay people," namely, "they tried to make [him] a homosexual." He also believed someone was "trying to kill [him] and give [him] the AIDS virus."

Despite the pervasiveness of these delusional thoughts, Gordon does not believe he is mentally ill. He has refused to participate in group therapy at DSH-Patton, though on cross-examination Dr. Bloch acknowledged that he may have participated in the past. Dr. Bloch testified that these therapy sessions are important to help a person understand mental illness and how to control it. Moreover, while Gordon is compliant with his medication in order to "play along with the system" so that he can get released, he has no intention of continuing with his medication upon release.

Dr. Bloch's determination that Gordon presented a danger to the public was based on several factors. First, his criminal rap sheet revealed a consistent pattern of "dangerous or potentially dangerous" behavior, not "simply one-off kind of behavior." Next, Gordon believed he does not have a mental illness and therefore has no need for medication. But the "crux" of Dr. Bloch's opinion was Gordon's "active delusional process that has led to . . . dangerous behaviors." Dr. Bloch testified that, even with the two antipsychotic medications that Gordon was currently taking, it was apparent

5

that his paranoid delusions persisted. If Gordon stopped taking them altogether, his symptoms would become "far more pronounced" and "the dangerousness attendant to those delusions would become more prominent and he can do something very similar that he's done in the past."

Dr. Bloch highlighted Gordon's history of alcohol abuse and his eagerness to drink again upon release. In fact, Gordon refused to participate in the conditional release program (CONREP)[4] because of its prohibition on drinking. Gordon also admitted that, before he was incarcerated, he used to self-medicate with methamphetamine, which Dr. Bloch explained accelerates psychotic symptomology. This history coupled with the stressors that Gordon would experience if released from DSH-Patton concerned Dr. Bloch. He believed Gordon would again self-medicate with alcohol and other substances, which would "accelerate his psychiatric symptoms, impair his judgment further, and perhaps cause him to behave in a dangerous way."

On cross-examination, Dr. Bloch acknowledged that Gordon has had no recent instances of aggression, has not threatened anyone, and has not destroyed any property. He also acknowledged that Gordon has embraced religion at DSH-Patton, does not consume drugs or alcohol, and declines pruno[5] even though it is readily available to him.

2.    *Dr. Randy Stotland*

Dr. Stotland is a forensic and clinical psychologist. He, too, interviewed Gordon, reviewed his medical records, and criminal rap sheet. Dr. Stotland

---

[4]    CONREP is a conditional outpatient release program to which patients are discharged upon leaving DSH. Failure to comply with the terms of the program may result in a return to inpatient treatment.

[5]    Pruno is an alcoholic beverage typically made in a prison setting from fermented food.

opined that Gordon meets the criteria as an MDO. Namely, Gordon suffers from schizophrenia, he is not in remission, and he represents a substantial danger of physical harm to others.

Dr. Stotland's testimony was largely similar to Dr. Bloch's in terms of Gordon's presentation of symptoms and the nature of his delusions. Dr. Stotland observed Gordon to be "very delusional," claiming to speak by satellite with his wife every day and with Mr. Ardsell several times a week. He described Gordon's thought process as "grandiose, illogical, difficult to follow." Dr. Stotland also believed Gordon had impaired intellectual functioning.

When asked about his commitment offense, Gordon told Dr. Stotland that he did it to get help from the police because Mr. Ardsell was trying to involve him in a sacrificial religious ceremony. Since Gordon's current thought process was similar to his thoughts at the time of the commitment offense, Dr. Stotland was concerned that, without supervision, those thoughts could lead him to engage in similar behavior.

Like Dr. Bloch, Dr. Stotland highlighted that Gordon lacks insight in that he does not believe he has a mental illness that needs treatment. Although Gordon was presently compliant with his antipsychotic medication, he took the medication only because it helps him remain calm and avoid confrontations with the other mentally unstable patients at the hospital. If he was released, Gordon claimed he would not need medication because he would be around "normal" people.

While discussing his history with alcohol and controlled substances, Gordon told Dr. Stotland that he used to drink alcohol from the ages of 13 to 24 but then switched to wine, which he only drank on the weekends. Gordon had also used cocaine, crack, and marijuana and used methamphetamine five

times. Dr. Stotland explained that a history of substance abuse increases the risk for violence because the substances tend to make people more aggressive and lower their ability to inhibit aggression.

Dr. Stotland considered a recommendation for outpatient treatment at CONREP based on Gordon's learning disability and the absence of aggressive behaviors at DSH-Patton. But if Gordon's release was unsupervised, Dr. Stotland opined that he would be a substantial danger of harm to others because he is "not involved in treatment, doesn't believe in treatment, doesn't believe he has a problem, he's not sorry for the crime, he feels that he was framed, he refuses to go to CONREP and be in a supervised outpatient program, he has no relapse prevention plans . . . . He intends to drink alcohol when he gets out. He's very delusional. And those–has no family, no support system. And basically, he has no way to deal with the stress it would take to live in the community at this time."

    3.    *Dr. Ryan Jordan*

The People's third and final witness was Dr. Jordan, a senior psychologist specializing in forensic psychology with DSH-Patton. Dr. Jordan attested to a violence risk assessment, known as the Historical Clinical Risk Management 20 (HCR-20), that he conducted regarding Gordon. The HCR-20 consists of 20 variables that fall under one of three domains: historical factors, which do not change; clinical factors, which are dynamic and apt to change; and risk management factors, which look at a specific timeframe or scenario. A clinician conducting this assessment scores these factors and creates a risk formulation as to the individual's risk likelihood in certain situations. The HCR-20 is deemed more accurate in predicting or judging risk than just a clinical opinion.

8

In conducting this assessment, Dr. Jordan reviewed Gordon's medical records and consulted with his treatment team members. Dr. Jordan did not personally meet with Gordon.

Of the 10 historical factors, Dr. Jordan believed Gordon met eight of them. This included problems with violence; relationships; previous employment; substance abuse a major mental disorder; and treatment or supervision. It also included a history of traumatic experiences and violent attitudes. Gordon did not meet the factors for problems with antisocial behavior or a personality disorder.

Regarding the clinical domain, Dr. Jordan believed Gordon met three of the five factors. This included lack of insight, which considers whether a patient has an understanding of their mental illness, the impact substances may have on it, and the need to treat their illness. Gordon also met the factor for symptoms of a mental illness or major mental disorder, as well as the factor regarding supervision and response, which addresses whether the patient is complying with his recommended treatment. However, Gordon did not meet the factors for violent ideation or intent, which is based on behavior in the previous 12 months, or for instability.

As for the final five factors in the domain of risk management, which are considered in the context of unsupervised release into the community, Dr. Jordan testified that Gordon met all five. This included the risk factor for professional services and planning since Gordon did not have a discharge plan or a willingness to engage in outpatient mental health services. Gordon also met the factors for living situation, considering he did not have a safe, secure location where he planned to reside; for personal support due to a limited support network; and for treatment or supervision response, which addresses a likelihood of whether the patient will continue with his

9

treatment plan.  Lastly, Dr. Jordan found that Gordon met the risk factor for stress and coping, which determines how equipped a patient is to handle stress following discharge.

These factors led Dr. Jordan to conclude that, in the context of an unsupervised outpatient environment, Gordon poses a high risk of engaging in violent behavior.

3.    *The Trial Court's Order Granting the People's Petition*

Following its review of the evidence and hearing arguments of counsel, the court found that the People had proven beyond a reasonable doubt that Gordon still suffers from a severe mental disorder that is not in remission and that he represents a substantial danger of physical harm to others.  The court relied on Gordon's delusions about Mr. Ardsell, which were the cause of the commitment offense and which had not abated over time or with medication.  "[I]f the delusions led to prior violent conduct, they certainly could indicate propensity for future violent conduct."  The court held that simply releasing Gordon out to the public "would be very dangerous to him, as well as the public.  Especially if he doesn't believe he has a mental illness and he's not promising to take his meds.  And he's got a risk of violent behavior, according to Dr. Jordan and the other two doctors."  The court therefore granted the People's petition and ordered Gordon committed to DSH-Patton for another year (until May 24, 2022).  Gordon's timely appeal followed.

## DISCUSSION

Gordon argues substantial evidence does not support the trial court's finding that he represented a substantial danger of physical harm to others due to a severe mental disorder.  He specifically contends there was no

10

evidence that he posed a current threat of dangerousness. We conclude substantial evidence supports the trial court's findings.

A.    *Legal Standards*

"The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission. (Pen. Code, § 2960 et seq.)" (*In re Qawi* (2004) 32 Cal.4th 1, 9 (*Qawi*).) "[T]he purpose of the scheme is to provide MDO's with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder. (Pen. Code, § 2960.)" (*Ibid.*)

" 'The MDO Act establishes a comprehensive scheme for treating prisoners who have severe mental disorders that were a cause or aggravating factor in the commission of the crime for which they were imprisoned. (See § 2960.) The act addresses treatment in three contexts—first, as a condition of parole (§ 2962); then, as continued treatment for one year upon termination of parole (§ 2970); and finally, as an additional year of treatment after expiration of the original, or previous, one-year commitment (§ 2972).' [Citation.]" (*People v. Cobb* (2010) 48 Cal.4th 243, 251.)

"Commitment as an MDO is not indefinite; instead, '[a]n MDO is committed for . . . one-year period[s] and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year.' " (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063, disapproved on other grounds in *People v. Harrison* (2013) 57 Cal.4th 1211, 1230.) To obtain an extension, the People must prove beyond a reasonable doubt that (1) the defendant continues to have a severe

11

mental disorder; (2) the defendant's severe mental disorder is not in remission or cannot be kept in remission without treatment; and (3) because of his or her severe mental disorder, the defendant continues to represent a substantial danger of physical harm to others. (§ 2972, subd. (c).)

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding." (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082.)

B. *The Recommitment Order Is Supported by Substantial Evidence*

Gordon contends the trial court erred because the evidence is insufficient to support the finding that he poses a substantial danger of physical harm to others by reason of his severe mental disorder. In support, he relies on *People v. Johnson* (2020) 55 Cal.App.5th 96 (*Johnson*). There, the appellant, Johnson, served nine years in prison for repeatedly striking a woman he did not know from behind with a board. (*Id.* at pp. 98–99.) Johnson was delusional at the time, believing the woman was a renter who owed him money. (*Id.* at p. 99.)

After Johnson completed his sentence, he was paroled as an MDO to Atascadero State Hospital and then civilly committed under the MDO Act at Napa State Hospital the following year. (*Johnson, supra*, 55 Cal.App.5th at p. 98.) Twice, Johnson was released as an outpatient in CONREP, first from 2004-2008 and then from 2008-2014. (*Ibid.*) Each time, however, he was returned to the hospital after he went absent without leave (AWOL). (*Ibid.*) Thereafter, the trial court granted the People's yearly petition for recommitment. (*Id.* at pp. 98–99.)

In 2019, the court held a trial on the People's most recent petition for recommitment. (*Johnson, supra,* 55 Cal.App.5th at p. 99.) At the time, Johnson was 69 years old. (*Ibid.*) Rafael Chang, a case manager for CONREP, did not believe Johnson would be suitable for CONREP because he had only a 29 percent participation rate in group therapy at the hospital and because Johnson did not believe he had a mental illness or needed medication. (*Ibid.*) Chang testified that Johnson " 'could quickly decompensate without taking his medications, especially if he believes he does not have a mental illness or he requires medication.' " (*Ibid.*) He acknowledged, however, that there were no incidents of violence or aggression in Johnson's medical records. (*Ibid.*) Chang also acknowledged that while Johnson was in CONREP, and even when he went AWOL, there was no record of violent or aggressive behavior. (*Id.* at p. 100.)

Johnson's treating psychologist, Dr. Hugo Schielke, opined that Johnson is schizophrenic with symptoms that include paranoid delusions and flat affect. (*Johnson, supra,* 55 Cal.App.5th at p. 100.) According to Dr. Schielke, Johnson did not recognize that he had a mental health issue and symptoms, and he was not motivated to participate in group treatment. (*Id.* at p. 101.)

Johnson's treating psychiatrist, Dr. Alaric Frazier, opined that Johnson met the criteria for an MDO. (*Johnson, supra,* 55 Cal.App.5th at p. 101.) He testified that Johnson had schizophrenia; it was in "partial remission," meaning Johnson had severe delusions when he was unmedicated though some of the delusions had "gone away" with medication; and he represented a substantial danger of physical harm to others, based on the 1990 offense, his lack of insight into his mental illness, and his refusal to continue his medication if released. (*Id.* at pp. 101–102.) Dr. Frazier was also concerned

13

that Johnson did not have a relapse prevention plan, which would help him know what to do if he started to experience symptoms. (*Id.* at p. 102.)

On cross-examination, Dr. Frazier acknowledged that the only evidence of violence in the record was Johnson's commitment offense and an incident before he was adjudged an MDO. (*Johnson, supra,* 55 Cal.App.5th at p. 103.) He also acknowledged that Johnson was described by hospital staff as "liked and cooperative," "a quiet gentleman," and "pleasant." (*Ibid.*) Further, he recognized that a diagnosis of schizophrenia accompanied by a lack of insight into one's mental illness and a need to treat it does not necessarily translate into a tendency to act violently in an unsupervised setting. (*Id.* at pp. 103–104.) Nevertheless, Dr. Frazier testified that in Johnson's case, his lack of insight and schizophrenia made him dangerous because of his response to delusions in 1990. (*Ibid.*) "The longer appellant 'is without his medications, the more delusional he will become, and he is likely to act out in a violent manner in response to those delusions.' " (*Id.* at p. 104.)

The trial court granted the People's petition for recommitment. (*Johnson, supra,* 55 Cal.App.5th at p. 104.) It found the decision "difficult" because there were no recent incidents of violence that would suggest Johnson was a danger to others. (*Ibid.*) It was ultimately persuaded, however, by Johnson's failure to appreciate his mental illness, his refusal to comply with his medication regimen, and the presentation of symptoms when he went AWOL from CONREP. (*Id.* at p. 105.) The court also relied on the fact that Johnson did not have a relapse plan and was unwilling to participate in CONREP again. (*Ibid.*)

The appellate court reversed. (*Johnson, supra,* 55 Cal.App.5th at p. 111.) It noted that the only evidence of Johnson's dangerousness came from Dr. Frazier, which relied on "appellant's violence from decades earlier,

14

with only friendly and nonconfrontational behavior ever since, even while he was AWOL from CONREP, off of his medications for a significant period of time, and decompensating. [¶] Such a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining an MDO defendant's dangerousness." (*Id.* at p. 110.) The court concluded that while there was ample evidence that Johnson was mentally ill and that he was not in remission, the record was devoid of *any* evidence that his mental illness translated to a risk of substantial danger of physical harm to others. (*Id.* at pp. 109, 111–112.)

We agree with Gordon that there are striking similarities between *Johnson* and this case. In both, the patients are in their 60s with impaired intellectual functioning, they suffer from schizophrenia that is only in partial remission, they do not believe they have a mental illness and see no need for treatment, they intend to discontinue medication if released, the commitment offense was remote in time, and there were no recent incidents of violence or aggression.

Where we disagree with Gordon is that *Johnson* mandates reversal. As is often the case, it is the differences that make all the difference. In *Johnson*, Dr. Frazier opined that Johnson presented a risk of substantial danger of harm to others based on several factors, none of which actually suggested a risk of harm. Here, all three experts expressed concern that, despite Gordon's compliance with antipsychotic medications, his paranoid delusions about Mr. Ardsell persisted. These same delusions were present when he committed the underlying offense 25 years earlier. As a matter of fact, Gordon admitted that he threw the metal cover *because* he wanted the police's help with Mr. Ardsell. Dr. Bloch and Dr. Stotland testified that

15

Gordon's paranoid delusions about Mr. Ardsell would only increase if he was released to an unsupervised setting and he stopped taking his medication.

Of further concern was Gordon's history of alcohol and substance abuse, a factor that was not present in *Johnson*. Gordon admitted that he abused alcohol and illicit substances in the past, and the record reflects that a cocaine pipe was found on his person when he was arrested for the commitment offense. Dr. Bloch and Dr. Stotland explained that alcohol and illicit substances exacerbate paranoid delusions, which are a specific concern in this case because Gordon told both doctors that he wanted to drink again. Indeed, his refusal to participate in CONREP was due, in part, on its restrictions on alcohol.

These factors led Dr. Bloch, Dr. Stotland, and Dr. Jordan to opine that Gordon's severe mental disorder presented a substantial danger of physical harm to others. Gordon's argument that their opinions were not premised on recent acts of violence is not persuasive. As section 2962, subdivision (g) provides, " 'substantial danger of physical harm' does not require proof of a recent overt act." (See also *Qawi, supra*, 32 Cal.4th at p. 24 ["[A] finding of recent dangerousness is not required."].)

Finally, we observe that Johnson had been released twice to CONREP for extended periods of time with no evidence of violent or aggressive behavior. Even when he was AWOL and off of his medication, there was no record of any violent or aggressive behavior. The record before us does not contain similar evidence as to Gordon, whether in a supervised or unsupervised outpatient setting.

Thus, after reviewing the entire record in the light most favorable to the order continuing Gordon's commitment as an MDO, we are satisfied that a reasonable trier of fact could find beyond a reasonable doubt that, because

16

of his severe mental health disorder, Gordon represented a substantial danger of physical harm to others.

DISPOSITION

The order of the trial court is affirmed.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.