Filed 9/16/25  State Dept. of State Hospitals v. E.C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE DEPARTMENT OF STATE HOSPITALS, | F088661 |
| Plaintiff and Respondent, | (Super. Ct. No. 24CRAD687452) |
| v. | |
| E.C., | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Stephanie L. Negin, Judge.

Linda J. Zachritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Sierra E. Killian, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Hill, P. J., Detjen, J. and DeSantos, J.

Appellant E.C., an individual committed to the State Department of State Hospitals (DSH) in Coalinga (DSH-Coalinga) as an offender with a mental health disorder (OMD),[1] appeals the trial court's order authorizing the involuntary treatment of E.C. with antipsychotic medications. E.C. contends substantial evidence does not support the court's finding he does not have the capacity to make treatment decisions. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

E.C. was committed to DSH-Coalinga as an OMD in December 2018. His commitment has been extended on a yearly basis since then pursuant to Penal Code section 2972. On October 9, 2023, the trial court issued an order authorizing the involuntary treatment of E.C. with antipsychotic medications.[2]

On June 21, 2024, DSH-Coalinga petitioned the trial court to renew the order compelling E.C.'s involuntary medication for another year. The petition specified E.C. was diagnosed with schizoaffective disorder. He suffered from hallucinations, agitation, paranoid delusions, responding to internal stimuli, disorganized speech, depressive mood, and self-injurious behavior. E.C. reportedly believed he was " 'Gabriel Angel of Jesus Christ.' " He attempted to hang himself twice and has a history of injuring himself in various ways. E.C. insisted he suffered from no mental illnesses and was not in need of antipsychotic medications. Because of his mental illness, he was not able to appreciate the benefits and risks of accepting versus rejecting treatment.

The trial court appointed the public defender to represent E.C. and ordered DSH-Coalinga to provide all medical records to the public defender's office. A hearing

---

[1]  Effective January 1, 2020, Penal Code section 2962 was amended to replace "mentally disordered offender" with "offender with a mental health disorder." (Pen. Code, § 2962, subd. (d)(3), as amended by Stats. 2019, ch. 649, § 1.)

[2]  " 'Antipsychotic medication' means any medication customarily prescribed for the treatment of symptoms of psychoses and other severe mental and emotional disorders." (Welf. & Inst. Code, § 5008, subd. (*l*).)

All undesignated statutory references are to the Welfare and Institutions Code.

on the petition was set for September 16, 2024.

At the September 16, 2024 hearing, the parties proceeded on both the issues of E.C.'s capacity and dangerousness.[3]  The trial court found Dr. Joseph Liu, E.C.'s treating psychiatrist, qualified as an expert in the field of psychiatric treatment.

Liu testified at the hearing.  He was assigned to E.C.'s unit in February 2024.  Liu regularly met with E.C. by video every month.  E.C. attended every meeting with Liu, which lasted for 15 to 30 minutes.

E.C. was diagnosed with schizoaffective disorder bipolar type.  He thought he was Jesus Christ.  E.C. denied he had a mental problem and talked nonstop when discussing his diagnosis or medication as a treatment option.  Liu opined E.C. was not aware he had a mental illness.  He told Liu, " 'I don't have any mental problem[s].' "  E.C. was prescribed Depakote, Zyprexa, and Haldol.  Liu denied E.C. experienced side effects from the medications, which kept him at baseline.  E.C. "always" said he did not need medications.  He did not understand the benefits and risks of treatment.  Liu did not believe E.C. was able to understand knowingly and intelligently and rationally evaluate and participate in treatment decisions.

E.C. had quite a few incidents of aggression.  In August 2023, he punched a peer in the face and was put on one-on-one watch.  When Liu followed up with E.C. about this incident, E.C. admitted he hit the other patient first, who responded by threatening E.C.

---

[3]      The September 16, 2024 minute order conflicts with the transcript of the hearing. The minute order states the parties stipulated to bifurcate the issues of capacity and dangerousness, and the trial court was only addressing the issue of capacity.  The parties do not dispute both issues were addressed at the hearing and the court's order contains rulings on both.  We credit the reporter's transcript over the conflicting September 16, 2024 minute order.  (See *People v. Harrison* (2005) 35 Cal.4th 208, 225; *People v. Anzalone* (2013) 56 Cal.4th 545, 552, fn. 6 [where nothing suggests the reporter's transcript is incomplete, we presume the court reporter accurately reported the proceedings]; *Arlena M. v. Superior Court* (2004) 121 Cal.App.4th 566, 570 [where the minute order and reporter's transcript are in conflict, "the reporter's transcript generally prevails as the official record of proceedings"].)

Liu did not witness the incident, but a staff member did. E.C. had a janitorial job on the unit working two hours per day as part of his treatment but lost his job due to this altercation.

E.C. was also aggressive toward staff. He had an incident where he was yelling, not following direction, and going after his peers. Staff had to escort him off the unit. In November 2023, he was verbally aggressive toward a psychiatrist. When Liu talked to him about these incidents, E.C. denied them or blamed others. E.C. was charged with assault with a deadly weapon while in DSH in Napa. Liu opined if E.C. was not administered antipsychotic medication, he would be a danger to staff and others. He had a history of self-injury including attempting to hang himself.

Liu opined there were no less intrusive ways to render E.C. nondangerous other than the administration of involuntary antipsychotic medication. He did not believe E.C. would take the medications at the required dosages without an involuntary order in place because E.C. always told Liu he did not need medication. E.C. was only compliant with taking medication because of the involuntary order. When Liu met with E.C. one-on-one or during quarterly team meetings, E.C. engaged in basic conversation but became agitated when discussing medication. The meetings went smoothly until the talk turned to medication, which triggered E.C. to talk nonstop and express paranoid delusions.

On cross-examination, Liu denied E.C. reported side effects from the medications. He never complained about hand tremors or erectile dysfunction, but he did complain about the medications giving him posttraumatic stress disorder (PTSD). Liu confirmed he obtained his medical degree in China and was born there. He had been practicing English for years. Liu denied E.C. told Liu he had trouble understanding what Liu was telling him or some of the words Liu said in English.

E.C. testified on his own behalf at the hearing. He said Liu was not trustworthy because Liu knew E.C.'s name was in the bible, and "they" wanted to deny he was Jesus

Christ.  E.C. testified China gained $7 for each dollar we spent in China.  He also said China was in control of all the world banks.

During testimony, E.C.'s counsel observed E.C.'s right hand was shaking.  E.C. testified the medications "attack[ed]" his central nervous system.  His right hand and whole body shook, including his other hand.  E.C. told Liu about these side effects many times.  His body was also observed to be twitching, which E.C. said he was unable to control.

E.C. admitted he got irritated when he talked with Liu because Liu wanted to increase his medication.  He acknowledged the medications kept him from being aggressive but testified he could be given some aspirin to keep him from being aggressive.  E.C. denied he was an aggressive person.

When E.C. told Liu the medications gave him muscle tremors, Liu said it was not from the medication.  He also told Liu the medications caused erectile dysfunction.  E.C. said Haldol has a 70 to 71 percentage rate of causing this side effect.  He was told by Liu he was in the 28 percent who did not have this side effect, although E.C. reported signs of it to Liu.  He felt like "they" were trying to "deform" him to destroy his ability to have children in the future.

E.C. also believed the medications gave him PTSD.  He then referenced God, Jesus Christ, the governor, the destruction of oranges, and that JFK "was murdered by Lee Harvey Oswald, the son of a dirt farmer."  After the court reporter asked him to slow down and speak louder, E.C. talked about Jesus Christ walking on water and that the bible said, "treasures for Jesus, and death Hell's Angels."  He held up a piece of paper with a drawing and the word "Gabriel" written on it.

When asked about the incident in August 2023, E.C. said he struck his peer because the peer struck E.C. first.  He had asked a friend for a shot of coffee and the peer said to E.C., " 'Well why do you ask us for coffee, you have a job.' "  E.C. told the peer to "mind [his] own business" and the peer responded he was going to tell staff.  E.C.

5.

responded, " 'Go ahead,' " so the peer told staff E.C. was threatening somebody over a shot of coffee. This led to staff pulling E.C. aside and asking why he was asking for coffee. E.C. told his sister on the phone about the incident and the peer overheard E.C. call him a " 'rat.' " The peer verbally threatened E.C. and came toward him. E.C. threw down his glasses and stood up as the peer approached. The peer threw several punches at him which E.C. blocked but the peer managed to scratch his face. E.C. then punched the peer. Staff pulled the peer away and E.C. went back to his room. E.C. threatened the peer after the fight was over.

On cross-examination, E.C. testified he was completely sure he had no mental illness whatsoever. He said all the medications made him more paranoid and feel like he was floating on air. They took all the energy out of him. E.C. thought if he stopped taking all his medications, he would get better. He would not take the medications in the required dosages if the involuntary order were not in place. E.C. explained before he was diagnosed with schizoaffective disorder, he was malingering to get out of trouble with the law. E.C. would say "crazy" things like he was hearing voices so he would be sent to the hospital. He claimed everyone believed that diagnosis because it was in his file and was passed on over the years.

E.C.'s counsel recalled Liu. Liu testified he noticed E.C. visibly shaking during their first meeting but did not observe him shaking in their subsequent meetings. He said the shaking was better when E.C. was standing and acknowledged he could see the shaking when E.C. was sitting. He offered medications to help with that side effect.

After hearing both parties' arguments, the trial court discussed Liu's and E.C.'s testimonies. E.C. interrupted the court twice during the court's discussion and the court advised E.C. that he would be muted if he continued to interrupt. The court found E.C. was not aware of his situation, did not understand the benefits and risks of treatment as opposed to alternative interventions, and did not understand or knowingly, intelligently, voluntarily, and rationally participate in the treatment decision. The court also found

DSH had established E.C.'s dangerousness by clear and convincing evidence based on his behavior over the last six years, in that he had attempted, inflicted, or threatened physical harm on another due to his mental illness. DSH further established E.C. was dangerous based on violent or threatening acts within the year preceding E.C.'s most recent commitment. The court granted DSH's petition and ordered the involuntary medication be administered for one more year. The order issued that same day.

## DISCUSSION

E.C. argues the trial court's finding on capacity was not supported by substantial evidence because the evidence was insufficient that he was unable to discuss the risks and benefits of medication. He claims the court accepted DSH's version of E.C.'s ability despite DSH's contradictory and conflicting evidence.

A competent adult has a common law and constitutional right to refuse medical treatment, including the administration of antipsychotic drugs. (*In re Qawi* (2004) 32 Cal.4th 1, 14.) An OMD has the right to refuse to take medication. (*Ibid*.) But an OMD's "right to refuse antipsychotic drugs is qualified." (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1013 (*Fisher*).) An OMD's right to refuse antipsychotic medication may be overcome by a judicial determination that (1) the OMD is incompetent to refuse treatment; or (2) the OMD is dangerous within the meaning of section 5300.[4] (*Qawi*, at p. 27.) Either finding is sufficient to support an involuntary medication order. (*Ibid*.)

"The superior court shall determine competence to refuse treatment by clear and convincing evidence, 'so clear as to leave no substantial doubt, [and] sufficiently strong

---

[4] Section 5300 provides in relevant part: "(a) At the expiration of the 14-day period of intensive treatment, a person may be confined for further treatment pursuant to the provisions of this article for an additional period, not to exceed 180 days if one of the following exists: [¶] (1) The person has attempted, inflicted, or made a serious threat of substantial physical harm upon the person of another after having been taken into custody, and while in custody, for evaluation and treatment, and who, as a result of a mental health disorder, presents a demonstrated danger of inflicting substantial physical harm upon others."

7.

to command the unhesitating assent of every reasonable mind.' [Citation.] A judicial determination of competency to refuse treatment involves consideration of three factors: (1) whether the patient is aware of his situation and acknowledges the existence of his condition; (2) whether the patient understands the benefits and risks of treatment, as well as alternatives to treatment; and (3) whether the patient is able to understand and evaluate the information required to be given to patients whose informed consent is sought and participate in the treatment decision by rational thought processes." (*State Dept. of State Hospitals v. J.W.* (2018) 31 Cal.App.5th 334, 343–344, citing *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1322–1323.)

"We review an order authorizing involuntary administration of antipsychotic medication for substantial evidence." (*Fisher*, *supra*, 172 Cal.App.4th at p. 1016.) Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

Substantial evidence supports the finding E.C. was not competent to refuse treatment. Liu testified E.C. was not aware he had a mental illness. E.C.'s testimony supported that conclusion. He claimed to be "completely sure" he had no mental illness whatsoever. His belief his schizoaffective disorder diagnosis resulted from pretending he was hearing voices reflected his refusal to acknowledge his mental illness. Contrary to E.C.'s claim, the issue "cannot fairly be characterized as a simple disagreement between a

patient and his doctor" regarding whether the treatment's detriments outweigh the benefits. (*State Dept. of State Hospitals v. A.H.* (2018) 27 Cal.App.5th 441, 447.) Though Liu initially denied E.C. reported side effects from the medications, he later acknowledged E.C.'s visible tremors. Liu testified, however, the only way to keep E.C. nondangerous was through antipsychotic medications. The medications kept him at a baseline. E.C.'s suggestion aspirin would be sufficient to keep him from being aggressive revealed he did not understand the benefits and risks of treatment. Aspirin is not a reasonable alternative to treatment with antipsychotic medications. E.C. repeatedly told Liu he does not need medication and believed he would get better if taken off medication. He would not take the medications if not for the involuntary order in place. His denial of his need for medication was concomitant with his refusal to accept the existence of his mental illness. Though E.C. engaged during his meetings with Liu and other staff, he would talk nonstop and expressed paranoid delusions when the topic turned to treatment of his disorder. This conduct was also evident from the hearing's transcript and demonstrated his inability to knowingly and intelligently evaluate and participate in the treatment decision by rational thought processes. When asked about his treatment, E.C. responded with tangents referencing Jesus Christ, the governor, JFK, and fruit. The court reporter had to ask E.C. more than once to slow down during his testimony, indicating the pressurized speech Liu described. He twice interrupted the trial court's explanation of its ruling. All three factors to address competency support the court's finding on E.C.'s capacity.

E.C. only challenges the trial court's finding on capacity and expressly does not challenge the finding on dangerousness. Because the evidence supports the finding E.C. is incompetent to refuse treatment and E.C. only challenges that finding, we need not address the court's alternative finding E.C. is a danger to others within the meaning of section 5300. In any event, the record supports the court's finding on E.C.'s dangerousness as well. A finding of dangerousness under section 5300 "requires a

9.

particularized showing that the person is a demonstrated danger and that he or she was recently dangerous. [Citation.] In the case of an [OMD], the commitment offense may establish demonstrated dangerousness and recent dangerousness consists of 'violent or threatening acts specified in section 5300 within the year prior to the commitment or recommitment.' " (*Fisher*, *supra*, 172 Cal.App.4th at p. 1016, citing *In re Qawi*, *supra*, 32 Cal.4th at pp. 21, 28, fn. 7.) E.C. had multiple incidents of aggression including punching and threatening a peer in August 2023. He was also verbally aggressive toward staff and a psychiatrist. E.C. lost his janitorial job due to his aggressive conduct. (*Fisher*, at pp. 1016–1017 [substantial evidence supported dangerousness where the evidence showed the patient during his commitment "threatened physical violence, masturbated in front of female staff, and took papers from staff and threw them on the floor, becoming physically threatening"].) The court acknowledged there was some discussion as to whether E.C. acted in self-defense during the fight with his peer but observed E.C. admitted he threatened the peer after the fight was over. The trier of fact resolves conflicting evidence, and we do not second-guess the court's resolution of evidentiary conflicts on appeal. (*People v. Yeoman* (2003) 31 Cal.4th 93, 128 [the trier of fact weighs the evidence, resolves evidentiary conflicts, and determines the credibility of witnesses].)

We conclude there was substantial evidence from which the trial court could reasonably find it was highly probable E.C. lacks the capacity to refuse treatment and is a danger to others. We therefore affirm the order.

## **DISPOSITION**

The order is affirmed.

10.